DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                       JACKSONVILLE DIVISION

3

4   DILLON S. WEBB,

5            Plaintiff,

6   vs.                        CASE NO. 3:19-cv-00975-MMH-JBT

7   TRAVIS M. ENGLISH, CHAD
    KIRBY, AUSTIN DAMPIER, and
8   SHERIFF MARK HUNTER,                    **CERTIFIED COPY**

9            Defendants.
    _____/
10

11

12              VIDEO-TELECONFERENCE DEPOSITION OF

13                    CORPORAL CHAD KIRBY

14

15              taken on behalf of the Plaintiff

16

17       DATE TAKEN:          November 5, 2020
         TIME:                10:10 a.m. - 12:10 p.m.
18       PLACE:               Third Circuit Reporters & Video
                              136 Southwest Nassau Street
19                            Lake City, Florida 32025

20       Examination of the witness taken before:

21              Carol Day, CSR, RPR, Court Reporter
                Notary Public, State of Florida at Large
22

23

24              THIRD CIRCUIT REPORTERS & VIDEO
                     Toll-Free:  855-850-7038
25                   www.AllCourtReporters.com

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 2

```
 1   A P P E A R A N C E S:

 2           ANDREW M. BONDERUD, ESQUIRE
             THE BONDERUD LAW FIRM, P.A.
 3           301 West Bay Street, #1433
             Jacksonville, Florida 32202
 4           904-438-8082
             BonderudLaw@gmail.com
 5
                 Appearing on behalf of the Plaintiff by
 6               video-teleconference

 7           JUSTIN K. GELFAND, ESQUIRE
             IAN T. MURPHY, ESQUIRE
 8           MARGULIS GELFAND, LLC
             8000 Maryland Avenue
 9           Suite 420
             St. Louis, Missouri 63105
10           314-390-0234
             justin@margulisgelfand.com
11           ian@margulisgelfand.com

12               Appearing on behalf of the Plaintiff by
                 video-teleconference
13
             MATTHEW J. CARSON, ESQUIRE
14           SNIFFEN & SPELLMAN, P.A.
             123 North Monroe Street
15           Tallahassee, Florida 32301
             850-205-1996
16           mcarson@sniffenlaw.com

17               Appearing on behalf of the Defendants

18

19

20

21

22

23

24

25
```

Page 3

1                          I N D E X

2                                                    Page

3    TESTIMONY OF CORPORAL CHAD KIRBY:

4          DIRECT EXAMINATION - By Mr. Murphy           4

5          CROSS-EXAMINATION - By Mr. Carson           64

6    CERTIFICATE OF OATH                               65

7    CERTIFICATE OF REPORTER                           66

8    ERRATA SHEET                                      68

9

10
     PLAINTIFF'S EXHIBITS PREMARKED FOR IDENTIFICATION:
11
          Exhibit Number 1                             4
12           (Videotape - retained by Mr. Murphy)

13        Exhibit Number 50                            4
             (Offense Report)
14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1         (Plaintiff's Exhibit 1 and Exhibit 50 were premarked for

 2         identification.)

 3    THEREUPON:

 4                         CORPORAL CHAD KIRBY,

 5    was called as a witness and, after having been duly sworn,

 6    was examined and testified as follows:

 7              THE WITNESS:  Yes, ma'am.

 8                       DIRECT EXAMINATION

 9    BY MR. MURPHY:

10         Q.   Please introduce yourself for the record, Corporal.

11         A.   My name is Corporal Chad W. Kirby.  I work for the

12    Columbia County --

13         Q.   And just for the benefit of the court reporter,

14    Corporal, can you please spell your first and last name?

15         A.   C-h-a-d, last name is K-i-r-b-y.

16         Q.   Thank you.  Corporal Kirby, my name is Ian Murphy.

17    I am an attorney representing Dillon Webb, the plaintiff, in

18    a lawsuit in which you are a defendant.

19              Are you familiar with this case?

20         A.   Yes, sir.

21         Q.   And, Corporal Kirby, you are, in fact -- corporal

22    is your current title; is that correct?

23         A.   Yes, sir.

24         Q.   Corporal Kirby, have you been deposed before?

25         A.   Yes, sir.
```

Page 5

```
 1      Q.    In the context of criminal cases or civil cases or

 2  both?

 3      A.    Both.

 4      Q.    Okay.  Well, then you probably understand most of

 5  how this is going to go today, but just to make sure we are

 6  on the same page about a few things, a deposition allows us

 7  as attorneys to gather information regarding a pending

 8  lawsuit.  I am going to be asking you questions and you are

 9  required to answer the questions truthfully under oath.

10            Do you understand that?

11      A.    Yes, sir.

12      Q.    And if at any point you don't understand my

13  questions, if I ask anything that you don't understand,

14  please let me know and I will try to restate the question in

15  a way that makes sense to you.

16            And please don't answer a question unless you are

17  sure that you understand what it is that I am asking.

18            Does that sound fair?

19      A.    Yes, sir.

20      Q.    And so also just be sure to speak very clearly for

21  the benefit of the court reporter.

22            Try to avoid any nods or head shakes or uh-huhs or

23  huh-uhs, things like that, just so that she can make a very

24  clear record.

25            And then also just because of the unique
```

Page 6

1   circumstances of conducting this deposition by Zoom

2   video-conference today, please be sure to speak clearly just

3   so that I can hear you fine as well.

4          Does that sound good?

5      A.   Yes, sir.

6      Q.   And then the one final thing is just be sure to do

7   your best to wait until I finish asking a question before you

8   start answering so that we are not talking over each other,

9   and I will do my best not to start asking my next question

10  before you finish answering my last question, okay?

11     A.   Yes, sir.

12     Q.   All right.  So I just want to gather a little bit

13  of background information about you, if I can.

14          Tell me, how far did you go in school?

15     A.   I graduated with a high school diploma.

16     Q.   Did you ever get any further education beyond high

17  school?

18     A.   Other than vocational certificates, no.

19     Q.   Okay.  What kind of vocational certificates did you

20  get?

21     A.   Law enforcement.

22     Q.   And where did you get your vocational certificate

23  for law enforcement?

24     A.   Santa Fe College.

25     Q.   And you completed that program?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 7

 1      A.   Yes, sir.

 2      Q.   Okay.  And I assume that was prior to you becoming

 3  a law enforcement officer?

 4      A.   Yes, sir.

 5      Q.   Okay.  Okay.  So let's talk about your work

 6  history.

 7           You are currently employed by the Columbia County

 8  Sheriff's Office?

 9      A.   Yes, sir.

10      Q.   How long have you worked for the Columbia County

11  Sheriff's Office?

12      A.   March 14th, 2014.

13      Q.   And your current job title is corporal?

14      A.   Yes, sir.

15      Q.   How long have you been a corporal?

16      A.   Since the ending -- the end of 2017.  I want to say

17  October of 2017.

18      Q.   And just generally tell me what are your job

19  responsibilities as a corporal?

20      A.   Overall supervision.

21      Q.   So do you provide supervision for deputies?

22      A.   Yes, sir.

23      Q.   Any other ranks within the police department other

24  than deputy that you supervise?

25      A.   No, sir.

Page 8

1     Q.    And tell me what training did you have to go

2    through prior to becoming a Columbia County Sheriff's

3    officer?

4     A.    Seven hundred and 70 hours is mandated by the state

5    for law enforcement officers.

6     Q.    Seven hundred 70 hours specifically like -- are we

7    talking about a police academy or what do you mean by that?

8     A.    Yes, it's the basic law enforcement academy.

9     Q.    Got it.  And when you were initially hired back in

10   2014, what rank were you?

11    A.    I was a deputy.

12    Q.    And did you -- were you a deputy all the way up

13   until the time that you became a corporal in 2017?

14    A.    Yes, sir.

15    Q.    Okay.  So no other jobs other than deputy and

16   corporal with the Columbia County Sheriff's Office?

17    A.    I mean, ever or just as it has to do with the

18   sheriff's office?

19    Q.    I mean since working at the Columbia County

20   Sheriff's Office you were a deputy and then you were a

21   corporal.

22          Was there anything else in between?

23    A.    No, sir.

24    Q.    Okay.  And obviously you went through the 770 hours

25   mandated training kind of at the outset of your career.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 9

1            Do you have to do any ongoing training or anything

2    like that?

3        A.   Yes, sir.

4        Q.   How does that work?

5        A.   Well, the state mandates that we attend training

6    every four years.

7        Q.   And what does that entail?

8        A.   It varies.

9        Q.   Give me some examples.

10       A.   I couldn't do that for you today.  I would have to

11   look at the -- I would have to look at the -- the training

12   online.  I mean, it's something that's put on through the

13   SJSTC.  I am not familiar with what they are doing this year.

14       Q.   Okay.  When was the last time you did one of these

15   four-year training sessions?

16           MR. CARSON:  Object to form.

17           You can answer if you can.

18           THE WITNESS:  Probably last year.

19   BY MR. MURPHY:

20       Q.   Okay.  And what was covered at that session last

21   year?

22       A.   Ethics.  I really -- I really don't recall.

23       Q.   Okay.  How long did that training session last?

24       A.   I don't recall.

25       Q.   Was it a couple of hours or a couple of days?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 10

1      A.   Oh, it was within a day.

2      Q.   Okay.  Is there any sort of testing or anything

3  like that or is it just training?

4      A.   Depends on the training modules.

5      Q.   Okay.  At that one last year was there a test?

6      A.   I don't recall.

7      Q.   All right.  So prior to getting employed with the

8  Columbia County Sheriff's Office, did you have any other

9  jobs?

10      A.   Yes, sir, many.

11      Q.   Any other jobs in law enforcement?

12      A.   No, sir.

13      Q.   Okay.  Without going through all of them, what type

14  of work did you perform before becoming a law enforcement

15  officer?

16      A.   I was a business owner.

17      Q.   What type of business?

18      A.   Landscaping and irrigation.

19      Q.   How long did you do that?

20      A.   Off and on for -- off and on for probably five

21  years, four years.

22      Q.   Okay.  And prior to this lawsuit, had you ever been

23  named in a lawsuit?

24      A.   Not that I am aware of.

25      Q.   Have you ever sued anyone?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 11

 1     A.   No, sir.

 2     Q.   All right.  And so within the Columbia County

 3   Sheriff's Office, have you ever been reprimanded or been

 4   investigated for any complaints made against you?

 5     A.   No, sir.

 6     Q.   Have you ever been arrested or charged with a crime

 7   personally?

 8     A.   Yes.

 9     Q.   When was that?

10     A.   2010 or 2011.

11     Q.   Where was that?

12     A.   Commonwealth of Virginia.

13     Q.   What were you arrested for?

14     A.   It was a -- it was not arrested.  It was a

15   mandatory court appearance for hunting migratory game birds

16   with an unplugged shotgun.

17     Q.   What was the disposition of that charge?

18     A.   Guilty.

19     Q.   Was it a plea of guilty?

20     A.   Yes, it was a plea of guilty.

21     Q.   What was the sentence or fine imposed?

22     A.   It was a monetary fine, and I do not recall the

23   amount.

24     Q.   Did you pay that fine?

25     A.   Yes, sir.

Page 12

```
 1        Q.    Were you placed on any term of probation or
 2   anything like that?
 3        A.    No, sir.
 4        Q.    Okay.  Any other arrests or charges or anything
 5   like that?
 6        A.    No, sir.
 7        Q.    Did you ever serve in the military?
 8        A.    I did.
 9        Q.    What branch?
10        A.    United States Navy.
11        Q.    When did you enlist?
12        A.    2006.
13        Q.    And how long did you serve?
14        A.    Until 2011.
15        Q.    And what was your discharge?
16        A.    Honorable.
17        Q.    Were you ever subject to any discipline when you
18   were with the U.S. Navy?
19        A.    No, sir.
20        Q.    And just jumping back real briefly to the Virginia
21   charge for hunting with an unplugged shotgun, was that a
22   federal or a state court matter?
23        A.    I would assume federal, being as it's a -- hunting
24   migratory game birds is a federal offense.  So I really don't
25   know honestly.  I didn't know much about law until now.
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 13

1      Q.    Okay.  All right.  Corporal Kirby, are you familiar

2   with Dillon Webb?

3      A.    In what sense, or can you rephrase it?

4      Q.    Do you know who Dillon Webb is?

5      A.    I know his name.  I don't know who he is.

6      Q.    Okay.  Have you ever met Dillon Webb personally?

7      A.    Briefly.

8      Q.    When?

9      A.    On Sunday, May 5th, 2019.

10     Q.    Tell me briefly, other than conversations with your

11   attorney, what did you do to prepare for today's deposition?

12     A.    I reviewed the offense report within the agency and

13   I reviewed the video from the dash camera.

14     Q.    How long ago did you review the video?

15     A.    What's today, Thursday?

16           MR. CARSON:  Yeah.

17           THE WITNESS:  Tuesday afternoon.

18   BY MR. MURPHY:

19     Q.    Did you watch it from start to finish?

20     A.    No, sir.

21     Q.    How much of it did you watch?

22     A.    The parts specifically pertaining to me.

23     Q.    Okay.  And did you review the offense report on

24   Tuesday afternoon as well?

25     A.    No, sir.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 14

1      Q.   When did you review that?

2      A.   Just now.

3      Q.   Okay.

4      A.   This morning.

5      Q.   Anything else other than review the report and

6    watch the portions of the video involving you?

7      A.   No, sir.

8      Q.   So at issue in this lawsuit is the traffic stop and

9    arrest of Dillon Webb occurring on May 5th, 2019, and it does

10   sound like you recall that incident; is that right?

11     A.   Yes, sir.

12     Q.   And so you were -- were you on duty that day?

13     A.   Yes, sir.

14     Q.   And at that time you were a corporal?

15     A.   Yes, sir.

16     Q.   Do you recall what shift you were working that day?

17     A.   Night shift.

18     Q.   And what hours is the night shift?

19     A.   1700 to 0500 hours.

20     Q.   And so you -- your shift had just started not that

21   long before this traffic stop happened; is that right?

22     A.   Yes, sir.

23     Q.   Okay.  And who conducted the traffic stop of Dillon

24   Webb?

25     A.   Officer English.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 15

```
 1        Q.   And so were you physically present at the time that
 2   that stop occurred?
 3        A.   Not physically present at the time the stop
 4   occurred.
 5        Q.   Okay.  But you eventually came to the scene of that
 6   traffic stop?
 7        A.   Yes, sir.
 8        Q.   How long after the traffic stop happened was it
 9   before you got there?
10        A.   I don't know as far as like specific minutes.  The
11   video would be able to indicate that better than I would.
12        Q.   Okay.  And just -- you know, I won't hold you to
13   it -- just ballpark, was it ten minutes, 15 minutes, an
14   hour --
15        A.   It was --
16        Q.   -- just generally?
17        A.   It was longer than 30 minutes.
18        Q.   Where were you at the time that the traffic stop
19   occurred?
20        A.   In my patrol vehicle.
21        Q.   And so you were just on patrol of the streets of
22   Columbia County?
23        A.   Yes, sir.
24        Q.   What is your understanding of why Deputy English
25   initiated the traffic stop of Mr. Webb?
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 16

1      A.    At the time of the stop or now?

2      Q.    Let's say at the time of the stop.

3      A.    I did not know why Deputy English traffic stopped

4  Mr. Webb at the time of the stop.

5      Q.    What is your understanding now of why Deputy

6  English made the traffic stop?

7      A.    For an obscene sticker posted to the outside of the

8  vehicle.

9      Q.    And why -- why is that your understanding?

10     A.    Can you rephrase?

11     Q.    What has caused you to believe or know that that's

12  the reason that Mr. Webb was pulled over?

13     A.    Well, now, as it is today, or even within the

14  confines of the traffic stop, I was conferred with over the

15  phone and I can read it in a written report.  That's how I

16  know.

17     Q.    Thank you.  So Deputy English called you at some

18  point during this traffic stop?

19     A.    Yes, sir.

20     Q.    And he says, I pulled over Mr. Webb because of the

21  sticker on his car?

22     A.    Yes, sir.

23     Q.    Is it your understanding that Mr. Webb had violated

24  any traffic laws at all?

25     A.    Not to my understanding, no.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 17

1      Q.   Was there an outstanding warrant for his arrest or

2  anything like that?

3      A.   No.

4      Q.   And so just to be clear, the only reason, to your

5  knowledge, that he was stopped was because of this sticker on

6  his truck?

7      A.   Yes.

8      Q.   What did the sticker say?

9      A.   I eat ass.

10     Q.   What do you understand those words to mean?

11     A.   I understand I eat ass to be just as that, sir.

12     Q.   Can you be more specific?

13     A.   Some form of contact between the face and mouth of

14  one individual and the rear buttock of another individual.

15     Q.   Is it your understanding that that's the only thing

16  that that phrase can mean?

17     A.   Yes.

18     Q.   And when you say the contact between the face and

19  mouth of one individual and the rear end of another, is that

20  a sex act in your mind?

21     A.   Yes.

22     Q.   And it can have no other meaning as far as you're

23  concerned?

24     A.   Not as far as I'm concerned.  As far as I

25  understand, that's the only meaning that it has.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 18

1      Q.   And to be clear, the phrase I eat ass, that's a

2   statement, correct?

3           MR. CARSON:  Object to form.

4           MR. MURPHY:  Is the -- I'll rephrase.

5   BY MR. MURPHY:

6      Q.   Is the phrase I eat ass a statement?

7           MR. CARSON:  Object to form.

8   BY MR. MURPHY:

9      Q.   You can answer.

10     A.   Yes, sir, the grouping of three words into a

11   statement, is that a statement, yes.

12     Q.   And so those three words grouped in that way

13   conveys a message?

14     A.   It's a statement, yes.

15     Q.   It's not three random nonsense words, in your view?

16     A.   Correct.

17     Q.   And that message appeared on the rear window of

18   Mr. Webb's vehicle, correct?

19     A.   Correct.

20     Q.   And so theoretically anybody driving on the road

21   could see that message?

22     A.   Yes.

23     Q.   Prior to May 5th of 2019, had you ever heard that

24   phrase before?

25     A.   Yes.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 19

1      Q.   Where?

2      A.   Lord.   The phrase is synonymous with a sex act, as

3  I have already stated, and in idle conversation with friends

4  outside my official capacity the statement has came up

5  indicating the act of anilingus, yes.

6      Q.   So your friends have used this phrase?

7      A.   Yes.

8      Q.   Have you used this phrase?

9      A.   No, sir.

10     Q.   When your friends used this phrase around you, what

11  was your response?

12     A.   There was no response.

13     Q.   They just said it and you looked at them and didn't

14  respond?

15     A.   It wasn't -- it was a group of people.  It wasn't

16  just two people having a conversation.

17     Q.   Were they trying to convince someone to engage in a

18  sex act when they said it?

19     A.   I think it was more along the lines of how nasty

20  and how vulgar it seemed in context when they were talking

21  about it.

22     Q.   Did anyone laugh --

23     A.   Yes.

24     Q.   -- when they said that?

25     A.   Yes.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 20

```
 1      Q.   Did you laugh?

 2      A.   I don't remember.

 3      Q.   How many times have you heard friends use this

 4  phrase approximately?

 5      A.   Once.

 6      Q.   Just once?  Do you recall who said it?

 7      A.   No, sir.

 8      Q.   Was this before May 5th, 2019?

 9      A.   Yes.

10      Q.   Generally, approximately how far before May 5th,

11  2019 did you hear this phrase?

12      A.   Sir, I don't know.

13      Q.   Did your friends say this in public?

14      A.   No, sir.

15      Q.   Did your friends say this in Columbia County?

16      A.   No, sir.

17      Q.   Where was it?

18      A.   In Alachua County.

19      Q.   Say that one more time, please.

20      A.   In Alachua County.

21      Q.   You are not a law enforcement officer in that

22  county, correct?

23      A.   That is correct.

24      Q.   Did you perceive that statement to be a crime?

25      A.   No, sir.
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 21

```
 1      Q.   So we've talked about whether you've heard this

 2   phrase before.

 3           Had you ever seen it -- have you ever seen the

 4   words I eat ass written anywhere before?

 5      A.   Prior to May 5th, 2019, no, sir.

 6      Q.   You have never seen it written anywhere on the

 7   Internet or anything like that?

 8      A.   Not that I'm aware of.

 9      Q.   Do you use any kind of social media personally?

10      A.   Yes.

11      Q.   Which social media platforms do you use?

12      A.   Facebook, Snapchat, Instagram.

13      Q.   Have you ever heard of an organization on social

14   media called BarstoolSports?

15      A.   No, sir.

16      Q.   All right.  So at some point during this traffic

17   stop on May 5th, 2019, did Deputy English contact you by

18   phone?

19      A.   Yes, sir.

20      Q.   Was that on a personal phone or a department issued

21   phone?

22      A.   That would be on my departmental issued phone,

23   supervisor --

24      Q.   So he called you and you received that call on your

25   department issued phone?
```

Page 22

```
 1      A.   Yes, sir.

 2      Q.   Is that how deputies, when they are working and

 3   when you are working, is that how they contact you typically?

 4      A.   Typically, but not all the time.

 5      Q.   So are there multiple ways to contact you, radio or

 6   phone, et cetera?

 7      A.   Yes.

 8      Q.   Is any one method preferable over another?

 9      A.   Depends on the situation or the circumstances.

10      Q.   And just to be clear, if a deputy has initiated a

11   traffic stop and wants to talk to you about it, calling you

12   on that phone is one of the appropriate ways to do so?

13      A.   If the conversation would entail a lengthy

14   conversation back and forth, then the preferred method would

15   be cell phone, yes.

16      Q.   Is your department issued phone recorded or

17   anything like that?

18      A.   No, sir.

19      Q.   And so you testified earlier that you were in your

20   patrol vehicle at the time this call happened?

21      A.   Yes, sir.

22      Q.   Is your vehicle equipped with a dash cam?

23      A.   Yes, sir.

24      Q.   And is the interior of your vehicle equipped with

25   audio recording devices?
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 23

1    A.    Yes, sir.

2    Q.    So presumably this conversation would have been

3    captured on your patrol vehicle?

4         MR. CARSON:  Object to form.

5    BY MR. MURPHY:

6    Q.    Was this conversation captured on the audio in your

7    patrol vehicle?

8    A.    No, sir.

9    Q.    Why?

10    A.    The camera and audio recording equipment that is

11    contained in the vehicle was not activated.

12    Q.    Why?

13    A.    I was not on a stop, a vehicle stop.  I was not on

14    a call.  It continuously records, but there's no audio.

15    Q.    I see.  And so is that consistent with the policy

16    in the Columbia County Sheriff's Office, that only when a

17    traffic stop or something similar is happening that those

18    devices are activated?

19         MR. CARSON:  Object to form.

20         You can answer.

21         THE WITNESS:  Yes.

22         MR. MURPHY:  And so I know you reviewed the dash

23         camera video from Deputy English's vehicle, I believe

24         you said on Tuesday.

25         I am going to go through, if I can make it work,

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 24

```
1        just a couple of portions of that video with you.

2             Bear with me for just one moment.

3             And just to be clear for the benefit of everybody,

4        this dash camera footage has been previously labeled as

5        Exhibit 1, and the parties have stipulated to its

6        authenticity.

7             I am going to share my screen.

8   BY MR. MURPHY:

9        Q.   Can you see this video on your screen, Corporal?

10       A.   Yes, sir.

11       Q.   And I am going to play it for you in just a second,

12   and let me know if you can hear that.

13            (The videotape was played.)

14   BY MR. MURPHY:

15       Q.   Can you hear that?

16       A.   Yes, sir.

17       Q.   Okay.  So just watch this and then we are going to

18   talk about it.

19            (The videotape was played.)

20   BY MR. MURPHY:

21       Q.   All right.  Corporal, did you hear all that

22   clearly?

23       A.   Yes, sir.

24       Q.   All right.  So in the video Deputy English has

25   issued a court date to Mr. Webb; is that right?
```

Page 25

1       A.    A notice to appear, yes, sir.

2       Q.    So he told him he has a notice to appear and gives

3   him a court date of May 23rd at 8 a.m.

4             Does that sound right?

5       A.    Yes, sir.

6       Q.    And in the video does it look like Mr. Webb read

7   the notice and then signed it?

8       A.    Yes, sir.

9       Q.    And so he now has a notice to appear for having

10  this sticker on his car, right?

11      A.    Correct.

12      Q.    All right.  I am going to let this video play for

13  another portion here.

14            (The videotape was played.)

15  BY MR. MURPHY:

16      Q.    Hey, Corporal, did you hear that?

17      A.    I did.

18      Q.    I'm sorry.  Did you hear that clearly?

19      A.    Yes, sir.

20      Q.    Thank you.  So what happens after Dillon Webb signs

21  the notice to appear?

22            MR. CARSON:  Object to form.

23  BY MR. MURPHY:

24      Q.    You can answer.

25      A.    In the video?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 26

1     Q.   Yes.

2     A.   I'm sorry.  Can you ask the question again, please?

3     Q.   Sure.  What does Deputy English say to Dillon Webb

4   after Dillon Webb has signed the notice to appear?

5          MR. CARSON:  Object to form.

6   BY MR. MURPHY:

7     Q.   You can answer.

8     A.   He asked Mr. Webb to remove one of the stickers.

9     Q.   And why does Mr. Webb say he won't do that?

10    A.   It clearly states in the video, sir.

11    Q.   Why does Mr. Webb say he won't do that?

12    A.   He says it's a violation of his First Amendment

13  rights.

14    Q.   Have you ever received any training on the United

15  States Constitution?

16    A.   In depth, no.

17    Q.   What level of training on the Constitution have you

18  received?

19    A.   The training received in the basic law enforcement

20  academy.

21    Q.   So that was in that 770-hour training you referred

22  to earlier?

23    A.   Correct.

24    Q.   During that training did they cover the First

25  Amendment?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 27

1    A.    Yes, sir.

2    Q.    What do you remember from your training on the

3  First Amendment?

4    A.    The right to free speech.

5    Q.    And so I know you watched this dash camera video

6  that's been marked as Exhibit 1 a couple of days ago, and I'm

7  not going to watch the whole thing with you, but is it your

8  understanding that Mr. Webb has failed to comply with any of

9  Deputy English's requests until this point?

10   A.    Until this point?  No, sir.

11   Q.    He answered all the questions that Deputy English

12  asked of him?

13   A.    I think that would be a question for Deputy

14  English, sir.  This video is not the full entire video, so I

15  don't know what was said before the start.

16   Q.    Well, just to make sure we are on the same page,

17  because the video is about an hour and a half and it starts

18  recording when Deputy English initiates his traffic lights to

19  pull Dillon Webb over, was there something before that?

20   A.    No, sir, but the video that you showed me is the

21  ending where Mr. Webb was issued a notice to appear.  It

22  wasn't all the verbatim questions and answers that were

23  spoken about before that your question was, did Dillon Webb

24  answer all of Deputy English's answers, and I'm sorry, sir,

25  but I cannot answer that.  I have not seen the full video.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 28

 1      Q.   Is it your understanding that Dillon Webb had been
 2   fully compliant with all of Deputy English's requests to this
 3   point?
 4      A.   Yes, sir.
 5      Q.   Did Dillon Webb exit his vehicle when Deputy
 6   English asked him to?
 7      A.   I would assume, yes.
 8      Q.   Did he provide identification to Deputy English
 9   when he asked him to?
10      A.   Yes.
11      Q.   Did he allow Deputy English to frisk him for
12   weapons when he exited his vehicle?
13      A.   I would assume yes.
14      Q.   So just to be clear, you have no reason to
15   believe -- and I know that you're saying you don't remember
16   everything from this video -- but you don't have any reason
17   to believe that Dillon Webb refused to comply with any
18   commands of Deputy English until Deputy English asked him to
19   remove a letter from his sticker?
20      A.   Correct.
21      Q.   I'm going to play a little bit more of this video.
22           (The videotape was played.)
23   BY MR. MURPHY:
24      Q.   Corporal, did you hear that clearly?
25      A.   Yes, sir.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 29

```
1       Q.   And so just to be clear, this is after Mr. Webb has
2  said, No, I'm not going to remove a letter from my truck,
3  Deputy English gets back in his car, and this is -- is this
4  you who he called?
5       A.   Yes, sir.
6       Q.   Okay.  And so according to Deputy English and this
7  statement that we just listened to together, why had he
8  stopped Mr. Webb?
9       A.   For the sticker on his back window.
10       Q.   And in that portion of the conversation did he tell
11  you that he had issued Mr. Webb a notice to appear?
12       A.   Yes.
13       Q.   And did Deputy English communicate to you that he
14  had asked Mr. Webb to remove a letter from the sticker?
15       A.   Yes.
16       Q.   And then he asks the question, Is that not
17  resisting?  Is that the question he asked you?
18       A.   Yes.
19       Q.   And what was the word that Deputy English used to
20  describe the message on the back of Dillon Webb's truck?
21       A.   I believe he stated obscene.
22       Q.   Let's watch it one more time.
23            (The videotape was played.)
24  BY MR. MURPHY:
25       Q.   Having listened to it again, what's the word that
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 30

1   Deputy English uses to describe the phrase?

2       A.   Statement.  And then at the end he says it's vulgar

3   or derogatory.

4       Q.   Does he call that derogatory?

5       A.   Yeah, derogatory.

6       Q.   Okay.  Thank you.  Then he said, I asked him to

7   remove a letter so that it's no longer derogatory.

8            Does that sound right?

9       A.   That sounds right.

10      Q.   And what is your understanding of why Deputy

11  English wanted a letter removed from the sticker?

12      A.   To take it out of the context in which it was

13  currently in.

14      Q.   Can you be more specific?

15      A.   I eat as does not have the same meaning as I eat

16  ass.

17      Q.   And we haven't watched this portion of the video

18  yet, Corporal, but do you recall what you said in return to

19  Deputy English's question, Is that not resisting?

20      A.   No, sir.

21      Q.   Let's watch a bit more of this.

22           (The videotape was played.)

23  BY MR. MURPHY:

24      Q.   Corporal, did you hear that all correct and

25  clearly?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 31

 1      A.   Yes, sir.

 2      Q.   Had you had any experience with this particular

 3   statute prior to this time?

 4      A.   No, sir.

 5      Q.   So you had never stopped anybody for displaying

 6   obscene words on a vehicle?

 7      A.   Correct.

 8      Q.   And you had never been contacted by any deputies

 9   whom you supervised who had tried to make a stop for someone

10   allegedly violating this statute?

11      A.   Correct.

12      Q.   Okay.  I'm going to play a bit more of the video.

13           (The videotape was played.)

14   BY MR. MURPHY:

15      Q.   Corporal, did you hear that clearly?

16      A.   Yes, sir.

17      Q.   Why did you ask Deputy English whether Dillon Webb

18   had been arrested before?

19      A.   Well, there was a series of questions that were

20   asked, but my intent was to gauge who this person is and see

21   if I could get any other information on -- on who he was.

22      Q.   And according to Deputy English -- and it sounds

23   like he performed a computer search -- had Dillon Webb ever

24   been arrested before?

25           MR. CARSON:  Object to form.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 32

1          THE WITNESS:  He said no, not in Columbia County.

2   BY MR. MURPHY:

3      Q.   Okay.  I'm going to let this play out a little bit

4   more.

5          (The videotape was played.)

6   BY MR. MURPHY:

7      Q.   Corporal, did you hear that all clearly?

8      A.   Yes, sir.

9      Q.   So at some point it sounds like, you know, you took

10  some time to read the statute and ask some follow-up

11  questions, but you eventually say, Take him to jail and tow

12  his shit; is that right?

13     A.   Yes, sir.

14     Q.   And you also said, I'm good with the statute?

15         MR. CARSON:  Object to form.

16  BY MR. MURPHY:

17     Q.   Did you say I'm good with the statute?

18     A.   Yes.

19     Q.   What did you mean by I'm good with the statute?

20     A.   Meaning I have read it, I understand it, and based

21  on the information provided by Deputy English, the situation

22  conforms to that statute.

23     Q.   When you said, quote, Tow his shit, what did you

24  mean by the word shit?

25     A.   Truck.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 33

```
1       Q.   So at this point the decision has been made to

2   arrest Mr. Webb; is that correct?

3            MR. CARSON:  Object to form.

4            THE WITNESS:  I don't know --

5   BY MR. MURPHY:

6       Q.   But you would -- I'm sorry.  I didn't mean to

7   interrupt.

8       A.   I don't know if at this point Deputy English had

9   made the decision to make the arrest or not.

10      Q.   When you said, Take him to jail and tow his shit,

11  what did you mean by that?

12      A.   It was guidance to Deputy English to resolve the

13  issue at hand.

14      Q.   Does take him to jail not mean place him under

15  arrest?

16      A.   It could have been, yes.

17      Q.   What else could it have been?

18      A.   Whatever Deputy English thought fit in the

19  situation.

20      Q.   Okay.  I'm going to let this play a bit more.

21           (The videotape was played.)

22  BY MR. MURPHY:

23      Q.   Corporal, did you hear that clearly?

24      A.   Yes, sir.

25      Q.   Did you say, Arrest him, take him to jail, and tow
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 34

 1  his shit?

 2       A.   I did.

 3       Q.   And then you said, That way we can get it off the

 4  road?

 5            Did you say that?

 6       A.   I did.

 7       Q.   What did you mean by get it off the road?

 8       A.   I was previously told that Mr. Webb was not wanting

 9  to remove one of the letters.  In order for law enforcement

10  to remove the violation, we tow it, get it off the road.

11       Q.   And by get it off the road, that would prevent

12  people from seeing this phrase?

13       A.   Correct.

14       Q.   What did you mean by arrest him?

15       A.   It was simple guidance from a supervisor to a

16  deputy on what actions he could have taken if he was not

17  satisfied with the notice to appear and Mr. Webb voluntarily

18  removing the violation, therefore, not committing a

19  misdemeanor any further, arrest him and take him to jail is

20  another option.

21       Q.   So when you said to Deputy English, who you

22  supervised, Arrest him, it was a suggestion?

23       A.   Yes.

24       Q.   If Deputy English said no, that would have been

25  fine?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 35

```
 1      A.   Yes.

 2      Q.   Has a deputy ever said to you, in response to a

 3 command to arrest someone, no?

 4           MR. CARSON:  Object to form.

 5           THE WITNESS:  Not that I am aware of.

 6 BY MR. MURPHY:

 7      Q.   Let's watch a bit more of this.

 8           (The videotape was played.)

 9 BY MR. MURPHY:

10      Q.   Corporal, did you hear that clearly?

11      A.   Yes, sir.

12      Q.   So at this point is Deputy English asking what to

13 do about the notice to appear?

14      A.   Correct.

15      Q.   And what was your suggestion?

16      A.   I told him to change it from a notice to appear to

17 an arrest report.

18      Q.   Thank you.

19           (The videotape was played.)

20 BY MR. MURPHY:

21      Q.   Could you hear that clearly, Corporal?

22      A.   Some of it was a little bit garbled, I think, at

23 the very end, but I heard most of it.

24      Q.   Okay.  Did you say just narrate in there that you

25 gave him the option to receive a court date for the
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 36

1  infraction with the understanding that he would remove one of

2  the letters so it was not obscene and he refused?

3      A.   I did tell Deputy English to narrate in his offense

4  report that Mr. Webb was given the option for a notice to

5  appear, and by failure of his own action to remove the letter

6  that he was arrested, if that's what you're asking.

7           I didn't tell Deputy English to just narrate in

8  there that he was offered a notice to appear and that he

9  refused.

10     Q.   I'm going to play it one more time and let's listen

11 really carefully to what you said.

12          (The videotape was played.)

13 BY MR. MURPHY:

14     Q.   Did you hear that, Corporal?

15     A.   Yes, sir.

16     Q.   Did you say, Just narrate in there that you gave

17 him the option to receive a court date for the infraction

18 with the understanding that he would remove one of the

19 letters?

20          MR. CARSON:  Object to form.

21          THE WITNESS:  Yes.

22 BY MR. MURPHY:

23     Q.   Is that true?

24          MR. CARSON:  Object to form.

25          THE WITNESS:  Is what true?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 37

 1  BY MR. MURPHY:

 2      Q.   Is it true that Deputy English had given Dillon

 3  Webb the option to receive a court date for the infraction

 4  with an understanding that he would remove one of the

 5  letters?

 6      A.   Dillon Webb was issued a notice to appear and asked

 7  to remove one of the letters, yes.

 8      Q.   Was he given the option to receive a court date

 9  with the understanding that he would remove one of the

10  letters?

11      A.   Rephrase the question, please.

12      Q.   We watched earlier when Deputy English gave Dillon

13  Webb a notice to appear to sign.

14           At that time, was there any -- prior to him signing

15  the notice to appear, was there any discussion about removing

16  one of the letters?

17           MR. CARSON:  Object to form.

18           THE WITNESS:  No.

19  BY MR. MURPHY:

20      Q.   So when we say later he had been given a court date

21  with the understanding that he would remove one of the

22  letters, is that true?

23           MR. CARSON:  Object to form.

24           THE WITNESS:  I'm not going to answer your question

25      true or false.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 38

1    BY MR. MURPHY:

2         Q.   Why?

3         A.   A notice to appear in the state of Florida is the

4    same thing as an arrest, it's just not a physical arrest.  He

5    has already been arrested for the infraction at hand.

6         Q.   That's an answer to a different question.

7              What I'm asking is had he been given the option to

8    receive a court date with an understanding that he would

9    remove one of the letters?

10        A.   I am going to say no, it wasn't a if you do this, I

11   will do this incident, to my understanding.

12        Q.   Great.  After the call from Deputy English to you

13   about this incident, did you have any further conversations

14   with Deputy English about this incident?

15        A.   Maybe briefly during the night as far as reviewing

16   the report, but nothing that I can recall.

17        Q.   What do you mean when you say briefly during the

18   night?

19             Like that same night?

20        A.   It would have been that same night, yes.

21        Q.   Do you recall what was discussed?

22        A.   No, sir.  And I didn't say that it did.  I said

23   maybe if it was spoken about it was probably briefly that

24   night.  At the end of the night --

25        Q.   Okay.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 39

1      A.    -- I usually do all the report review, and in

2   reviewing the report, if a question came up, such as missing

3   information or a checked block -- a checked box that has not

4   been checked, then I would have a conversation with him, but

5   I don't recall if that happened or not.

6      Q.    Fair enough.  And to your recollection, other than

7   that night, this wasn't something that you and Deputy English

8   discussed any further?

9      A.    No, sir.

10      Q.    Did you ever personally interact with Dillon Webb?

11      A.    Yes.

12      Q.    And you did that at the scene of the traffic stop?

13      A.    That is correct.

14      Q.    What was your -- scratch that.

15          Describe for me what happened in that interaction

16   with Mr. Webb.

17      A.    I spoke to him in the rear of Deputy English's

18   patrol vehicle.

19      Q.    Do you recall what he said?

20      A.    I asked him if he had brothers or sisters or if he

21   had friends that had kids, something along those natures.

22      Q.    Why did you ask him those questions?

23      A.    My intent for talking with Mr. Webb in the back of

24   the vehicle was to hopefully impart some education or some

25   guidance to Mr. Webb.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 40

1      Q.    And just to be clear, what do you mean by education

2   and guidance to Mr. Webb?

3      A.    We spoke -- I wanted to speak to him about the

4   difference in context versus how he could have made that same

5   statement in adult context versus the context that it was

6   currently in.

7      Q.    Was it your goal to educate him to use different

8   words?

9      A.    You almost say it like I was trying to help him

10  circumvent things.  No, that was not my goal.  My goal was to

11  educate Mr. Webb so that his protection under the First

12  Amendment did not violate Florida law because of a

13  misunderstanding.

14     Q.    Is it your understanding that a statement made

15  within his rights under the First Amendment is prohibited by

16  Florida law?

17     A.    Sir, a statement insinuates that it's verbally

18  spoken, whereas Mr. Webb was pulled over on this date for a

19  decal or sticker or placard that was permanently attached to

20  the exterior of the vehicle.  If it was a statement, it would

21  not be able to be read.

22     Q.    You are saying a statement can't be written?

23     A.    It can be.

24     Q.    Is it your position that a written statement

25  protected by the First Amendment can be illegal under Florida

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 41

```
 1  law?

 2          MR. CARSON:  Object to form.

 3          THE WITNESS:  Can you rephrase that question,

 4      please?

 5  BY MR. MURPHY:

 6      Q.  Let's scratch that.  Is it your understanding that

 7  Mr. Webb could have verbally said I eat ass and not have

 8  violated federal law?

 9          MR. CARSON:  Object to form.

10  BY MR. MURPHY:

11      Q.  Or Florida law rather?

12          MR. CARSON:  Object to form.

13          THE WITNESS:  In a peer group, in the privacy of

14      his own home, in privileged communication across a cell

15      phone, or privileged communication in a text message, if

16      that is Mr. Webb's wishes, then that's on Mr. Webb.

17  BY MR. MURPHY:

18      Q.  But saying I eat ass verbally, say, on a sidewalk

19  in Columbia County, would that violate Florida law?

20      A.  If a person is too close -- is so close to hear the

21  statement is offended or is outraged and deems it vulgar, and

22  is willing to be a witness, then, yes, sir, it would be a

23  criminal act.

24      Q.  So if a person hears a phrase that they find to be

25  vulgar or offensive, it could be a criminal act?
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 42

1          MR. CARSON:  Object to form.

2  BY MR. MURPHY:

3      Q.   Is that your testimony?

4          MR. CARSON:  Object to form.

5  BY MR. MURPHY:

6      Q.   You can answer.

7      A.   If it outraged -- yes, if it outrages the sense of

8  public decency, corrupts the public morals, and someone is

9  offended by the statement or the actions, then, yes, it would

10  be a criminal violation of criminal law in the state of

11  Florida.

12      Q.   Does the phrase I eat ass offend you?

13          MR. CARSON:  Object to form.

14          THE WITNESS:  Are you asking me personally or

15      professionally?

16  BY MR. MURPHY:

17      Q.   Let's start with personally.

18          MR. CARSON:  Same objection.

19          THE WITNESS:  I personally am not offended by those

20      words.

21  BY MR. MURPHY:

22      Q.   Does the phrase I eat ass offend you

23  professionally?

24      A.   Me professionally, I am not offended by those three

25  words.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 43

```
 1       Q.   Can the phrase I eat ass mean anything other than

 2  anilingus?

 3       A.   No, sir.

 4       Q.   Have you ever heard the phrase kiss my butt?

 5       A.   Sure.

 6       Q.   What do you take that phrase to mean?

 7       A.   Like get out of here.

 8       Q.   Does kiss my butt describe a sex act?

 9       A.   No, sir.

10       Q.   Why?

11            MR. CARSON:  Object to form.

12  BY MR. MURPHY:

13       Q.   You can answer.

14       A.   To some people it may.

15       Q.   But to you kiss my butt is not a description of a

16  sex act?

17       A.   No.

18       Q.   If kiss my butt was on a sticker on a vehicle in

19  Columbia County, would that be a violation of Florida law?

20       A.   Probably not.

21       Q.   Why?

22            MR. CARSON:  Object to form.

23            THE WITNESS:  It says kiss my butt.

24  BY MR. MURPHY:

25       Q.   Why doesn't that violate federal -- or excuse me --
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 44

1  Florida law?

2          MR. CARSON:  Object to form.

3          THE WITNESS:  Kiss my butt is a very commonly used

4      phrase, sir.

5  BY MR. MURPHY:

6      Q.   So the difference is that kiss my butt is a more

7  common phrase in our society?

8          MR. CARSON:  Object to form.

9          THE WITNESS:  Yes.

10 BY MR. MURPHY:

11     Q.   Would a bumper sticker that says kiss my ass be a

12 violation of Florida law?

13         MR. CARSON:  Object to form.

14         THE WITNESS:  I mean, it just depends on the

15     circumstances.

16 BY MR. MURPHY:

17     Q.   The circumstances are if it's on a bumper sticker

18 on a car in Columbia County, would that violate Florida law?

19         MR. CARSON:  Object to form.

20         THE WITNESS:  No.

21 BY MR. MURPHY:

22     Q.   Have you ever seen a vehicle with a bumper sticker

23 on it that offended you?

24     A.   I'm sure I've seen something that I have disagreed

25 with.  I wouldn't necessarily say be offended by it.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

                                                            Page 45
1        Q.   Have you ever conducted a traffic stop of a car for
2   displaying a bumper sticker?
3        A.   No, sir.
4        Q.   So at the time of this traffic stop you were --
5   were you Deputy English's supervisor?
6        A.   Yes, sir.
7        Q.   And is that why he chose to call you on the phone?
8             MR. CARSON:  Object to form.
9             THE WITNESS:  I would assume.
10  BY MR. MURPHY:
11       Q.   If the roles were reversed and you saw Mr. Webb
12  driving with the I eat ass bumper sticker on it, would you
13  have initiated a traffic stop?
14            MR. CARSON:  Object to form.
15            THE WITNESS:  I don't know.
16  BY MR. MURPHY:
17       Q.   Corporal Kirby, you testified earlier that you
18  reviewed the offense report in this case; is that right?
19       A.   Yes, sir.
20            MR. MURPHY:  I'm going to show you what's been
21       marked as Exhibit 50.
22            Can you see that on the screen?
23            MR. CARSON:  Justin, this is Matt.  We can see it,
24       but it's -- and it appears to be the offense report, but
25       none of it's legible.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 46

1          MR. MURPHY:  Okay.

2          MR. CARSON:  He's got a copy of it in front of him

3      that the court reporter printed out before we got here.

4          MR. MURPHY:  Oh, okay.  That would be easier.  I

5      apologize for the technical difficulties.

6  BY MR. MURPHY:

7      Q.   If you can just look at Exhibit 50 if that's in

8  front of you, Corporal?

9      A.   Yes, sir.

10     Q.   If you flip to the second page, at the very bottom

11 there on the bottom right there is a box that says approving

12 supervisor.

13     A.   Yes, sir.

14     Q.   Do you see that?  I'm sorry.  I talked over you.

15          Do you see that box?

16     A.   Yes, sir.

17     Q.   Is this your rank, deputy, or is that just a typo?

18     A.   That could probably be a typo.  They still

19 deposition me as deputy as well.

20     Q.   Okay.  But then does your name appear there in the

21 approving supervisor box?

22     A.   Yes, it does.

23     Q.   And is that your signature?

24     A.   Yes, it is.

25     Q.   Do you approve of what happened in this case?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 47

```
 1            MR. CARSON:  Object to form.

 2            THE WITNESS:  My signature in that block is the

 3       approval for the content of the offense report.

 4  BY MR. MURPHY:

 5       Q.   What does that mean?

 6       A.   Meaning that all the boxes are checked, there's no

 7  UCR errors, and that probable cause established for the

 8  arrest is narrated in the narrative.

 9       Q.   And so Deputy English was present on the scene, but

10  you were not there; is that right?

11       A.   Initially, that's correct.

12       Q.   So you weren't physically present until after the

13  arrest was made, right?

14       A.   Correct.

15       Q.   And is it fair to say that Deputy English was in a

16  better position to decide the best course of action?

17            MR. CARSON:  Object to form.

18            THE WITNESS:  That's correct.

19  BY MR. MURPHY:

20       Q.   And what I'm getting at, Corporal, is just, you

21  know, prior to you coming to the scene, what you knew was

22  what Deputy English had told you about what was going on; is

23  that fair?

24       A.   That's fair.

25       Q.   Do you believe Deputy English acted appropriately
```

Page 48

1    during this traffic stop and arrest?

2         A.   Yes.

3         Q.   With the benefit of hindsight, if this happened

4    today, would you still approve of everything that happened on

5    May 5th, 2019 with respect to this incident?

6         A.   With the benefit of hindsight, I would have only

7    changed one thing.

8         Q.   What's that?

9         A.   I would have just allowed the notice to appear to

10   take effect and go on about our business.

11        Q.   When you say allow the notice to appear to take

12   effect, what do you mean?

13        A.   Give him his notice to appear and allow him to

14   answer for the charge in open court.

15        Q.   And so that's with the benefit of hindsight.

16             At the time though Deputy English told you he

17   issued him a notice to appear, correct?

18        A.   Correct.

19        Q.   And after some discussion, the decision was made to

20   place Mr. Webb under arrest for non-violent resistance,

21   correct?

22        A.   Along with the charge of 847.011(2).

23        Q.   That's the obscenity statute?

24        A.   Yes, sir.

25        Q.   But he was placed under arrest for refusing to

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 49

 1  remove a letter, correct?

 2      A.   My interpretation of this is that was not the

 3  reason why he was physically arrested.  The reason why he was

 4  physically arrested was for a violation of Chapter

 5  847.011(2), which is the possession of the obscene material,

 6  followed by resisting because he refused to remove a letter

 7  from the writing on the back windshield making it not

 8  obscene, derogatory, vulgar.  Take it out of the context in

 9  which it was currently written.

10      Q.   What did Mr. Webb have to do to not be arrested and

11  taken to jail on May 5th, 2019?

12          MR. CARSON:  Object to form.

13          THE WITNESS:  Remove one of the letters of the --

14      off the vehicle, taking the context of the statement out

15      of its current condition and placing it either -- into a

16      context with more adult understanding.

17  BY MR. MURPHY:

18      Q.   What do you mean by place it into a context with

19  more adult understanding?

20      A.   I eat as, in my opinion, sir, does not have the

21  same context as I eat ass.

22      Q.   When you say context, do you mean it doesn't have

23  the same meaning?

24      A.   Correct.

25      Q.   Do you believe law enforcement officers have the

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 50

1  right to censor speech that offends them?

2          MR. CARSON:  Object to form.

3          THE WITNESS:  No.

4  BY MR. MURPHY:

5      Q.   To clarify, did Mr. Webb have to display a sticker

6  on his car with a different meaning than the meaning that he

7  had at that time of his traffic stop?

8          MR. CARSON:  Object to form.

9          THE WITNESS:  I'm sorry.  Can you say that again?

10 BY MR. MURPHY:

11     Q.   Did Mr. Webb have to display a sticker on his car

12 with a different meaning in order to leave the scene of the

13 traffic stop?

14         MR. CARSON:  Same objection.

15         THE WITNESS:  I apologize.  I'm not understanding

16     your question.

17 BY MR. MURPHY:

18     Q.   To go on his way, did Mr. Webb have to display a

19 sticker on his car with a different meaning than I eat ass?

20         MR. CARSON:  Same objection.

21         THE WITNESS:  No.

22 BY MR. MURPHY:

23     Q.   Explain why your answer is no.

24         MR. CARSON:  Same objection.

25         THE WITNESS:  I'm still a little confused about the

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 51

1      question.

2           Are you asking was he able -- could he have left

3      and -- with the sticker displaying something else or --

4      I'm sorry.

5  BY MR. MURPHY:

6      Q.   That's fair.  You testified a moment ago about the

7  phrase I eat as, meaning a-s, and having a different -- you

8  used the word context -- than the phrase I eat ass, and that

9  was what he refused to do; is that right?

10     A.   Correct.

11     Q.   Okay.  And so just to be clear, if he had been

12 willing to change the written phrase on his truck to I eat as

13 instead of I eat ass, would he have been permitted to go

14 home?

15          MR. CARSON:  Object to form.

16          THE WITNESS:  That would -- I'm sorry, sir, but

17     that's a decision or a question for Deputy English.

18 BY MR. MURPHY:

19     Q.   After this incident, did you talk to anyone about

20 this incident?

21     A.   Yes.

22     Q.   Who?

23     A.   Peers, other supervisors, other law enforcement

24 agencies.

25     Q.   Why did you talk to these people about it?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 52

```
 1      A.   It made national news.

 2      Q.   So you mentioned that you talked to your peers

 3  about this.

 4           What did you say to your peers about this?

 5      A.   I asked them -- I didn't specifically seek them

 6  out.  They kind of called me and we had a discussion about

 7  it, and they give me what they thought about it and I told

 8  them what I thought about it.

 9      Q.   And to be clear, when you say peers, do you mean

10  non-law enforcement people that you know?

11      A.   No, supervisors of my same rank.

12      Q.   So it's your testimony that you have never talked

13  to anyone outside of law enforcement about this incident?

14      A.   I may have mentioned things to my wife.  But as far

15  as complete random strangers on the road, no, sir.

16      Q.   Any of your personal friends talked to you about

17  this?

18      A.   Most of my personal friends are in law enforcement,

19  sir.

20      Q.   Understood.  In these conversations did anybody

21  laugh?

22      A.   Yeah.

23      Q.   And we touched on this a bit before, Corporal, but

24  what did you mean when you said at three separate points in

25  this video tow his shit?
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 53

```
 1      A.   Tow his vehicle.

 2      Q.   And so in that context the word shit means vehicle?

 3      A.   In a conversation between me and Deputy English, in

 4   that instance, yes.

 5      Q.   When you used the phrase tow his shit, did you say

 6   that over official police communication mediums, meaning over

 7   your department issued phone?

 8           MR. CARSON:  Object to form.

 9           THE WITNESS:  It was not over official police

10       mediums, but if you're asking was it over my agency

11       issued phone, yes.

12   BY MR. MURPHY:

13      Q.   And it was captured on the vehicle audio recording

14   system in Deputy English's vehicle; is that your

15   understanding?

16      A.   That it appears.

17      Q.   Can private citizens request and obtain videos and

18   audio recordings from cruisers in Columbia County?

19      A.   During a public records request, I am sure that

20   that may be something that's available to them; however, I do

21   not handle that type of request, sir.

22      Q.   Have you personally seen this dash cam video on the

23   Internet anywhere?

24      A.   Yes.

25      Q.   And so to be clear, the public was able to hear
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 54

1  you, in the context of your job, say the phrase tow his shit

2  multiple times?

3      A.   Correct.

4      Q.   Does the word shit have any other meaning besides

5  vehicle?

6      A.   Sure.

7      Q.   It can mean several different things, can't it?

8      A.   A plethora of stuff.

9      Q.   In your opinion, should you be cited or reprimanded

10  for using the word shit in the context of official police

11  business?

12          MR. CARSON:  Object to form.

13          THE WITNESS:  No.

14  BY MR. MURPHY:

15      Q.   Why?

16      A.   The conversation in which you overheard me say the

17  word shit was privileged communication between one individual

18  to another individual over a cellular device.  I did not

19  know, or nor did I know, that I was being recorded or that

20  the audio recording option of Deputy English's vehicle was

21  able to capture what I was telling him on the phone.

22          If I had -- or if I would have known that, I would

23  have elected to speak in different meanings.

24      Q.   Can the word ass mean more than one thing?

25      A.   That as a singular word itself, yes, sir.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 55

1     Q.   So after Mr. Webb, citing his First Amendment

2 right, refused to remove a letter from his sticker, Deputy

3 English decided to arrest Mr. Webb, correct?

4          MR. CARSON:  Object to form.

5 BY MR. MURPHY:

6     Q.   Let me rephrase that.  Did Deputy English decide to

7 arrest Mr. Webb?

8     A.   That's correct.

9     Q.   Did he do this with your approval?

10    A.   Yes, sir.

11    Q.   And Deputy English didn't call you about this

12 incident -- scratch that.

13         Did Deputy Kirby call you at any time prior to

14 Mr. Webb refusing to change the phrase on his car?

15         MR. CARSON:  Object to form.

16         THE WITNESS:  I'm sorry.  Was that question for me,

17    sir?

18 BY MR. MURPHY:

19    Q.   Yes.  Did Deputy English contact you at any point

20 during this traffic stop prior to asking Mr. Webb to remove

21 the letter from the sticker on his car?

22    A.   No, sir.

23    Q.   And he filled you in.  Did Deputy English tell you

24 that he had stopped Mr. Webb?

25         MR. CARSON:  Object to form.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 56

1            THE WITNESS:  Yes.

2    BY MR. MURPHY:

3        Q.   Did he tell you that he had asked Mr. Webb to

4    remove a letter from the sticker on his truck?

5        A.   Yes.

6        Q.   Did he tell you that Mr. Webb had refused?

7        A.   Yes.

8        Q.   Did you tell him to arrest Mr. Webb?

9        A.   Yes.

10       Q.   When you came to the scene of this traffic stop and

11   arrest, you said that you talked to Dillon Webb while he was

12   sitting in the back of the police cruiser; is that right?

13       A.   Yes, sir, that's correct.

14       Q.   Did you speak to anyone else while you were there?

15       A.   I spoke to his mother.

16       Q.   What happened in that conversation?

17       A.   I helped mediate a release of the vehicle on scene

18   between the tow truck company and -- forgive me, I'm not --

19   I don't remember her name, so for all intents and purposes I

20   will refer to her from here on out as the mother.

21       Q.   That's fair.  And so we've already agreed that the

22   word shit can mean different things, right?

23            MR. CARSON:  Object to form.

24            THE WITNESS:  Correct.

25   BY MR. MURPHY:

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 57

```
 1      Q.   And we talked about this, but can the word ass mean

 2   different things?

 3      A.   The singular word in itself, yes.

 4      Q.   Can it refer to a donkey?

 5      A.   Yes.

 6      Q.   Can it be used in a phrase such as don't be an ass?

 7      A.   Yes.

 8      Q.   And so you mentioned that you -- I think you used

 9   the phrase mediated the release of the truck to Mr. Webb's

10   mother; is that correct?

11      A.   Maybe that's a poor choice of words.  Assisted,

12   mediated, helped.  I helped the mother get Mr. Webb's vehicle

13   from the tow truck company on scene.

14      Q.   Got it.  I wasn't being critical of your word

15   choice.  I just wanted to make sure I got it right.

16           Where did this helping of his mother to get the

17   truck, where did that occur?

18      A.   On scene.  On the traffic stop.

19      Q.   Was Mr. Webb's truck actually on the towing rig?

20      A.   Yes, sir.

21      Q.   And what prompted you to help her to get the truck

22   off of the tow truck?

23      A.   I think in the instance it was Sunday, late Sunday

24   afternoon.  She claimed that the vehicle was needed.  I knew

25   the process from when the vehicle left the scene, how she was
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 58

1   going to have to recover it.  Nothing more than general

2   assistance in helping her achieve ultimately what she would

3   have had to do the next day anyway.

4        Q.   Did you require her to remove any letters from the

5   sticker before it was released from the tow truck?

6        A.   No, sir.

7        Q.   And she had to pay some money to the tow truck

8   company to get the truck down; is that right?

9        A.   That is correct.

10       Q.   And did you allow her to drive the vehicle home?

11       A.   I am pretty sure I left even before she left, so I

12   don't know if she drove the vehicle home or not.

13       Q.   Did you tell her that she could not drive the

14   vehicle home?

15       A.   I don't think so, but I don't recall either.

16       Q.   Given that you decided to release the truck to her

17   on the scene, why did you tell Deputy English to tow his shit

18   in the first place?

19            MR. CARSON:  Object to form.

20            THE WITNESS:  I didn't release the truck to her.

21   BY MR. MURPHY:

22       Q.   Who released the truck to her?

23       A.   A representative of Davis' Towing.

24       Q.   But you were involved in that decision, were you

25   not?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 59

```
 1        A.   I assisted, that is correct.

 2        Q.   Did you tell the tow truck driver that it would be

 3   okay to release the truck?

 4        A.   I did not.

 5        Q.   What do you mean by assisted?

 6        A.   I asked the tow truck driver if there was any way

 7   that the mother would be able to pay the monetary fine

 8   associated with the tow and retrieve the vehicle on Sunday

 9   instead of having to wait until Monday morning to retrieve

10   the vehicle and pay the associated storage fees.  The final

11   decision rests with the tow truck company.

12        Q.   Did the tow truck company do anything wrong in

13   allowing a vehicle with the phrase I eat ass to be placed

14   back on the streets of Columbia County?

15        A.   That's a question for them, sir.

16        Q.   Well, you're law enforcement and --

17        A.   Right.

18        Q.   -- it's been your office's position that this

19   sticker constitutes a violation of Florida law.

20             Did the tow truck company do anything wrong by

21   putting this truck back onto the streets of Columbia County?

22             MR. CARSON:  Object to form.

23             THE WITNESS:  They're not law enforcement, so I

24        would say no.

25   BY MR. MURPHY:
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 60

```
 1     Q.   Well, Dillon Webb is not law enforcement, is he?

 2     A.   Not to my knowledge.

 3          Can we take a five-minute break?

 4     Q.   Sure.

 5     A.   I would really like to use the restroom.

 6          MR. MURPHY:  Sure.  Me too.  Thank you.  Sorry

 7     about that.

 8          We will go off the record.

 9          (Recess.)

10  BY MR. MURPHY:

11     Q.   Corporal Kirby, you understand you are still under

12  oath?

13     A.   Yes, sir.

14     Q.   Have you ever seen a bumper sticker that says,

15  How's my driving, call 1-800 eat shit?

16     A.   I have not personally seen one, but I have seen

17  them posted on the Internet, yes.

18     Q.   Is that obscene?

19     A.   I think in the context in which it's written, no.

20     Q.   Why?

21          MR. CARSON:  Object to form.

22          THE WITNESS:  How is my driving insinuates a

23     question, I guess.  And then if you don't like the way

24     I'm driving then you can eat shit is basically the value

25     I get from that.  It could mean --
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 61

```
 1  BY MR. MURPHY:

 2       Q.   Is it funny?

 3       A.   No, it's --

 4       Q.   I'm sorry.  I didn't mean to interrupt you.

 5       A.   No, I don't see it being funny.  I see it being if

 6  you don't like the way that I drive, you can basically -- I

 7  don't care what you think.  I mean, that's kind of what I get

 8  out of it.  I don't think it's funny by no means, no.

 9       Q.   What do the words in this order mean, eat shit?

10            MR. CARSON:  Object to form.

11            THE WITNESS:  I guess it would be to eat excrement.

12  BY MR. MURPHY:

13       Q.   Could eat shit refer to a sexual act?

14            MR. CARSON:  Object to form.

15            THE WITNESS:  I don't know.

16  BY MR. MURPHY:

17       Q.   Have you ever seen one of those bumper stickers

18  with a cartoon Calvin from Calvin and Hobbs urinating on

19  something?

20       A.   You mean like the one that says like Ford or Chevy

21  or Dodge or something like that?

22       Q.   Exactly.

23       A.   I think the -- that sticker insinuates that

24  Mr. Calvin is pissing on something, but I don't think it

25  actually shows the act.
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 62

1      Q.   It doesn't show a cartoon drawing of urine flying

2  through the air and landing on a Ford logo?

3      A.   I think it --

4           MR. CARSON:  Object to form.

5           THE WITNESS:  I think it insinuates that that's

6      what it is.

7  BY MR. MURPHY:

8      Q.   Explain what you mean by the word insinuates.

9      A.   Doesn't that little cartoon character have his back

10  turned and his head over his shoulder and then the arc of

11  what you assume is urine landing on something?

12     Q.   Fair enough.  Is that obscene?

13     A.   Me personally?  No.

14     Q.   What about you professionally?

15     A.   No.

16     Q.   Are you aware of a video that came out a few years

17  ago of our current president using the phrase grab 'em by the

18  pussy?

19     A.   I am not.

20     Q.   You never heard that allegedly the president said

21  grab 'em by the pussy on video?

22     A.   No, sir.

23     Q.   Do you watch the news?

24     A.   From time to time.

25     Q.   And it's your testimony under oath you have never

Page 63

1   heard that allegedly Donald J. Trump said, Grab 'em by the

2   pussy?

3       A.   That is correct, sir.

4       Q.   If you saw a bumper sticker that said grab 'em by

5   the pussy dash Donald J. Trump, would you stop that vehicle?

6            MR. CARSON:   Object to form.

7            THE WITNESS:   Knowing what I know now?   No.

8   BY MR. MURPHY:

9       Q.   Why?

10      A.   That was -- the way that you read it insinuated a

11  quote by Donald J. Trump.

12      Q.   So a quote from Donald J. Trump can't be obscene?

13      A.   I'm not saying that it can't or can be, but I eat

14  ass has taken it -- has brought us to this position that we

15  are currently in, so I would be hesitant as a law enforcement

16  officer about enforcing anything that has to do with

17  obscenity or vulgarness or things of that nature.

18      Q.   Corporal, are sworn deputies expected to follow the

19  written policies of the Columbia County Sheriff's Office?

20      A.   Policies and procedures that are in place at the

21  sheriff's office are written as a guideline for deputies to

22  follow, that is correct.

23      Q.   So to be clear, sworn deputies are expected to

24  follow the written policies of the Columbia County Sheriff's

25  Office?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 64

1     A.   That is correct.

2          MR. MURPHY:  I think I am all done.  Thank you very

3     much for your time, Corporal.

4          Your attorney may have some questions for you.

5          THE WITNESS:  Yes, sir.

6                         CROSS-EXAMINATION

7  BY MR. CARSON:

8     Q.   I just have one question to clarify.

9          You said that you would be hesitant to enforce the

10  obscenity law now, correct?

11    A.   That's correct.

12    Q.   Is that a result of the non-prosecution of the

13  obscenity charge in this case?

14    A.   That is correct.

15         MR. CARSON:  I have no other questions, Ian.

16         Are you good?

17         MR. MURPHY:  I think we are good.

18         MR. CARSON:  All right.  He'll read.

19         Do you want to take a quick break -- and we can go

20    off the record?

21         (The deposition was concluded at 12:10 p.m.)

22

23

24

25

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 65

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA :

 4    COUNTY OF COLUMBIA:

 5

 6           I, Carol Day, CSR, RPR, Court Reporter and Notary

 7    Public, State of Florida, certify that CORPORAL CHAD KIRBY,

 8    who is personally known by me, appeared before me and was

 9    duly sworn on November 5, 2020.

10

11           WITNESS my hand and official seal this 19th day

12    of November 2020.

13

14

15

16

17

18                    _____

19                    CAROL DAY, CSR, RPR
                      CSR NO.:  13768
                      Notary Public - State of Florida
20                    Commission No:  GG 330952
                      Expires:  September 3, 2023
21

22

23

24

25
```

CAROL DAY
Commission # GG 330952
Expires September 3, 2023
Bonded Thru Budget Notary Services

NOTARY PUBLIC
STATE OF FLORIDA

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 66

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA :

4    COUNTY OF COLUMBIA:

5

6            I, CAROL DAY, CSR, RPR, Court Reporter, certify

7    that I was authorized to and did stenographically report the

8    foregoing proceedings; that a review of the transcript was

9    requested; and that the transcript is a true and complete

10   record of my stenographic notes.

11

12           I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties, nor am

14   I a relative or employee of any of the parties' attorney or

15   counsel connected with the action, nor am I financially

16   interested in the action.

17

18           DATED this 19th day of November 2020.

19

20

21   _____

22   CAROL DAY, CSR, RPR
     CSR NO.:  13768
23   Court Reporter

23

24

25

DILLON S. WEBB vs TRAVIS M. ENGLISH
Corporal Chad Kirby - 11/05/2020

Page 67

1   DILLON S. WEBB,

2          Plaintiff,

3   vs.

4   TRAVIS M. ENGLISH, et al,

5          Defendants.
                                    /
6

7   IN RE:  Deposition of CORPORAL CHAD KIRBY

8   TAKEN:  November 5, 2020

9   DATE SENT TO ATTORNEY:  November 19, 2020

10         The above-referenced transcript has been completed
    and awaits reading and signing.
11
           Please direct your client/witness to call our
12  office, 855-850-7038, to review a copy of the transcript and
    note any corrections on the attached errata sheet within 30
13  days or before the date of trial.  Once the errata sheet has
    been completed, please forward it to Third Circuit Reporters
14  & Video, 136 Southwest Nassau Street, Lake City, Florida,
    32025.  Once received, it will be forwarded to all ordering
15  parties.

16         Thank you.

17  cc:  Andrew M. Bonderud, Esquire
         Justin K. Gelfand, Esquire
18       Ian T. Murphy, Esquire
         Matthew J. Carson, Esquire
19

20

21

22

23

24

25