DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                        JACKSONVILLE DIVISION

 3

 4   DILLON S. WEBB,

 5            Plaintiff,

 6   vs.                          CASE NO. 3:19-cv-00975-MMH-JBT

 7   TRAVIS M. ENGLISH, CHAD
     KIRBY, AUSTIN DAMPIER, and
 8   SHERIFF MARK HUNTER,

 9            Defendants.
     _____/
10

11

12             VIDEO-TELECONFERENCE DEPOSITION OF

13                   OFFICER AUSTIN DAMPIER

14

15             taken on behalf of the Plaintiff

16

17        DATE TAKEN:        November 5, 2020
          TIME:              12:15 p.m. - 12:50 p.m.
18        PLACE:             Third Circuit Reporters & Video
                             136 Southwest Nassau Street
19                           Lake City, Florida 32025

20        Examination of the witness taken before:

21             Carol Day, CSR, RPR, Court Reporter
               Notary Public, State of Florida at Large
22

23

24             THIRD CIRCUIT REPORTERS & VIDEO
                  Toll-Free:  855-850-7038
25                www.AllCourtReporters.com
```

CERTIFIED COPY

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 2

```
 1  A P P E A R A N C E S:

 2          ANDREW M. BONDERUD, ESQUIRE
            THE BONDERUD LAW FIRM, P.A.
 3          301 West Bay Street, #1433
            Jacksonville, Florida 32202
 4          904-438-8082
            BonderudLaw@gmail.com
 5
                Appearing on behalf of the Plaintiff by
 6              video-teleconference

 7          JUSTIN K. GELFAND, ESQUIRE
            IAN T. MURPHY, ESQUIRE
 8          MARGULIS GELFAND, LLC
            8000 Maryland Avenue
 9          Suite 420
            St. Louis, Missouri 63105
10          314-390-0234
            justin@margulisgelfand.com
11          ian@margulisgelfand.com

12              Appearing on behalf of the Plaintiff by
                video-teleconference
13
            MATTHEW J. CARSON, ESQUIRE
14          SNIFFEN & SPELLMAN, P.A.
            123 North Monroe Street
15          Tallahassee, Florida 32301
            850-205-1996
16          mcarson@sniffenlaw.com

17              Appearing on behalf of the Defendants

18

19

20

21

22

23

24

25
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

```
                                                              Page 3
 1                          I N D E X

 2                                                              Page

 3  TESTIMONY OF OFFICER AUSTIN DAMPIER:

 4          DIRECT EXAMINATION - By Mr. Gelfand              4

 5  CERTIFICATE OF OATH                                      35

 6  CERTIFICATE OF REPORTER                                  36

 7  ERRATA SHEET                                             38

 8

 9

10  PLAINTIFF'S EXHIBITS PREMARKED FOR IDENTIFICATION:

11          Exhibit Number 52                                4
               (Columbia County Detention Inventory)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 4

1              (Plaintiff's Exhibit 52 was premarked for

2         identification.)

3    THEREUPON:

4                        OFFICER AUSTIN DAMPIER,

5    was called as a witness and, after having been duly sworn,

6    was examined and testified as follows:

7              THE WITNESS:  I do.

8                        DIRECT EXAMINATION

9    BY MR. GELFAND:

10        Q.   Good morning.

11        A.   Good morning.

12        Q.   Could you please state and spell your full name for

13   the benefit of the court reporter.

14        A.   Yes, sir.  Austin Joseph Dampier, A-u-s-t-i-n,

15   J-o-s-e-p-h, D-a-m-p-i-e-r.

16        Q.   Mr. Dampier, have you ever had your deposition

17   taken before?

18        A.   No, sir.

19        Q.   Okay.  I'm sure you're excited about this first

20   experience.

21              Mr. Dampier, I'm going to go over a couple of

22   ground rules.

23              You are obviously sitting in the room with your

24   attorney and with a court reporter.  The court reporter is

25   taking down what I am asking, any comments or objections or

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 5

1  questions that your attorney states on the record, and all of

2  your answers on the record.  So please, just if you would, to

3  make her job as easy as possible, just answer every question

4  verbally as opposed to head nods or anything like that, okay?

5      A.   Yes, sir.

6      Q.   If you don't understand any question that either I

7  am asking you or that your own attorney is asking you, would

8  you please ask us to rephrase that question?

9      A.   Yes, sir.

10     Q.   Okay.  I want to make sure that anything you answer

11 is a response to a question that you do understand.

12         So can we agree that if you do, in fact, answer a

13 question, that you do, in fact, understand that question?

14     A.   All right.  Yes, sir.

15     Q.   Okay.  Is there anything at all, Mr. Dampier, that

16 would prevent you from giving truthful testimony today?

17     A.   No, sir.

18     Q.   Are you on any medications, prescribed or

19 otherwise, that would inhibit your ability to remember or to

20 give truthful testimony today?

21     A.   No, no, sir.

22     Q.   Okay.  Mr. Dampier, what is your date of birth?

23     A.   October 2nd, 1990.

24     Q.   And what city and state do you currently reside in?

25     A.   Lake City, Florida.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 6

1    Q.    Are you currently employed?

2    A.    Yes, sir.

3    Q.    And what do you do for a living?

4    A.    I'm a law enforcement officer.

5    Q.    And do you have a rank?

6    A.    Sir?

7    Q.    Do you have a rank as a law enforcement officer?

8    A.    Just officer.

9    Q.    Okay.  Officer Dampier, where are you presently

10   employed in a law enforcement capacity?

11   A.    The Office of Agricultural Law Enforcement, the

12   Florida Department of Agriculture.

13   Q.    How long have you been employed by the Florida

14   Department of Agriculture?

15   A.    About, I guess, seven, eight months.  Since March.

16   Q.    Since March of 2020?

17   A.    Yes, sir.

18   Q.    What do you do just generally speaking in the

19   context of your current job?

20   A.    Basically we check for livestock, livestock coming

21   into the state, produce, stuff like that.  We inspect trucks,

22   U-Hauls.  We can perform any -- basically any law in the

23   state, traffic violations, stuff like that.

24   Q.    Prior to working for the Florida Department of

25   Agriculture where were you employed?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 7

```
 1      A.    At the Columbia County Sheriff's Office.

 2      Q.    How long were you employed at the Columbia County

 3   Sheriff's Office?

 4      A.    Just shy of three years.

 5      Q.    Do you remember just approximately in terms of

 6   month and year when you started and when you left?

 7      A.    I started in July of 2017 and I left in March of

 8   2020.

 9      Q.    Why did you leave your employment with the Columbia

10   County Sheriff's Office?

11      A.    To make more money.  The Department of Agriculture

12   pays more.

13      Q.    Did you leave on your own volition or were you

14   terminated?

15      A.    I left on my own.  I have --

16      Q.    When you were employed in the Columbia County

17   Sheriff's Office --

18            MR. CARSON:  Hold on.

19            MR. GELFAND:  -- what -- I'm sorry.

20            MR. CARSON:  I'm sorry.  He was finishing his

21      answer.

22            MR. GELFAND:  Oh, I apologize.

23            THE WITNESS:  No, I left for more money and I left

24      under good terms, no discipline or nothing, so...

25   BY MR. GELFAND:
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 8

1      Q.    Understood.  Thank you.  I apologize for talking

2   over you.

3           What was your position when you were an employee of

4   the Columbia County Sheriff's Office?

5      A.    I was a detention deputy, the booking officer,

6   booking deputy.

7      Q.    And in particular where were you a booking deputy?

8      A.    At the Columbia County detention facility.

9      Q.    And is the Columbia County detention facility, for

10  lack of a better way of putting it, the jail in Columbia

11  County?

12     A.    Yes, sir.

13     Q.    Were you always working in the jail, in other

14  words, the Columbia County detention facility, while you were

15  employed at the Columbia County Sheriff's Office?

16     A.    Yes, sir.

17     Q.    And what were your duties and responsibilities for

18  that position?

19     A.    Mostly intakes and releases of people coming in and

20  out, you know, but a little bit of everything.  Security,

21  accounting, transporting.  A little bit of everything.

22     Q.    Are you familiar with the policies and procedures

23  that were in effect at the Columbia County detention facility

24  while you were employed there?

25     A.    Yes, sir.

Page 9

 1     Q.   Officer Dampier, just backing up a little bit more

 2  about your employment, have you ever held any other law

 3  enforcement employment prior to the Columbia County Sheriff's

 4  Office?

 5     A.   I worked at the Florida Department of Corrections

 6  prior to that.

 7     Q.   What did you do at the Florida Department of

 8  Corrections?

 9     A.   I was a correctional officer.  I worked in a mental

10  health unit.

11     Q.   For approximately how long?

12     A.   Seven years.

13     Q.   Where was that?  Which facility or facilities?

14     A.   Suwannee Correctional Institution in Live Oak.

15     Q.   Any other law enforcement position prior to that?

16     A.   No, sir.

17     Q.   What, if any, training did you receive prior to

18  becoming a sworn law enforcement officer?

19     A.   What kind of training have I received?

20     Q.   Yes, sir.

21     A.   I have had -- I took some mental health -- mental

22  health courses, suicide prevention courses.  You know, just

23  stuff like that.  I can't think of the word.  Crisis

24  negotiation, stuff like that.

25          And then --

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 10

```
 1       Q.   Did you get that at what is commonly referred to as
 2   the police academy?
 3       A.   Oh, yes, sir.  I was going to say and I have
 4   attended the corrections academy and the police academy.
 5       Q.   What is your educational background?
 6            How far in school did you go?
 7       A.   High school diploma.
 8       Q.   When did you obtain your high school diploma?
 9       A.   2009.
10       Q.   Any other college, community college, vocational
11   school?  Any other education?
12       A.   Just strictly going through the corrections academy
13   and the police academy.
14       Q.   Have you ever served in the military, sir?
15       A.   No, sir.
16       Q.   Have you ever been arrested or convicted of a
17   crime?
18       A.   No, sir.
19       Q.   Have you ever been subject to any discipline in
20   your capacity as a law enforcement officer?
21       A.   No, sir.
22       Q.   Have you ever been the subject of any sort of
23   internal affairs type investigation?
24       A.   No, sir.
25       Q.   Is it fair to say you would remember if you had
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 11

1  because that's pretty serious stuff?

2      A.   Yes, sir.

3      Q.   Now, I want to direct your attention to May 5th of

4  2019.

5           Did you come across -- well, first of all, were you

6  on duty at the Columbia County detention facility on that

7  day?

8      A.   Yes, sir.

9      Q.   And do you recall approximately what shift you were

10 working that day?

11     A.   The night shift.

12     Q.   And what is the night shift?  What time to what

13 time?

14     A.   6 p.m. to 6 a.m.

15     Q.   When you were working that day at the Columbia

16 County detention facility -- I'm just going to refer to that

17 for purposes of this deposition as the jail.

18          Fair enough?

19     A.   Yes, sir.

20     Q.   You and I both know we are talking about the jail

21 that you were working at on that day?

22     A.   Yes, sir.

23     Q.   Okay.  When you were working at the jail on that

24 day, did you come into contact with an individual named

25 Dillon Webb?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 12

1      A.    Yes, sir.

2      Q.    Okay.  Prior to May 5th of 2019, had you ever met

3  Dillon Webb, to the best of your knowledge?

4      A.    No, sir, not to the best of my knowledge.

5      Q.    Okay.  Prior to that day had you ever communicated

6  in any way with Mr. Webb, to the best of your knowledge?

7      A.    No, sir.

8      Q.    Did you know who Dillon Webb was prior to that day?

9      A.    No, sir, not a clue.

10     Q.    Okay.  Is it fair to say that Dillon Webb was a

11  complete stranger to you until he walked into that -- into

12  the jail that you were working in?

13            Would that be fair?

14     A.    Yes, sir.

15     Q.    Okay.  Where in the jail was the first place that

16  you saw Mr. Webb?

17     A.    In the sally port area.

18     Q.    And is the sally port area an area where there's

19  basically essentially two garage doors and the patrol

20  vehicles pulled in to park?

21     A.    Yes, sir.

22     Q.    Okay.  When you saw Mr. Webb for the first time

23  where was he sitting or standing?

24     A.    He was already out of the patrol vehicle and he was

25  standing by where we process them at the table.  He already

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 13

1  had the cuffs off and everything.

2      Q.   Okay.  So to be clear, he was brought in in

3  custody; is that correct?

4      A.   Yes, sir.

5      Q.   He was under arrest, correct?

6      A.   Yes, sir.

7      Q.   Okay.  Did you initiate any conversation or

8  discussion with Mr. Webb?

9      A.   I instructed him to empty his pockets, and asked

10 him if he had anything on him, and instructed him to put his

11 hands on the wall, and I pat searched him.  I mean, that was

12 about it.

13          I had him take his shoes off.  And then after that

14 I escorted him to the X-ray machine we have and had him step

15 on that.

16     Q.   Did Mr. Webb, when you asked him to empty his

17 pockets, fully comply with each of your requests?

18     A.   Yes, sir.

19     Q.   Was it your understanding that he was required to

20 comply; in other words, he was in custody, you were the

21 jailer?

22     A.   I mean, that's usually how it goes.

23     Q.   When you told Mr. Webb to put his hands against the

24 wall, did he?

25     A.   Yes, sir.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 14

```
 1      Q.   Describe what you mean when you said you patted him
 2  down.
 3      A.   I performed a pat search, a frisk search, just, you
 4  know, to check him for contraband.
 5      Q.   Did you find any contraband?
 6      A.   No, sir.
 7      Q.   Did you pat down his entire body at the time with
 8  your hands?
 9      A.   Yes, sir.
10      Q.   From head to toe?
11      A.   From his chest area -- no, you do it in quadrants.
12  You start with the right side, left side, and work your way
13  down.
14      Q.   Down to where?  Describe it, if you would, in as
15  much detail as you can, please.
16      A.   Okay.  You just go from the top, you check around
17  his waistband and then from the bottom of his ankle just, you
18  know, looking for contraband.
19      Q.   Okay.  And to be clear -- and I don't mean this in
20  a loaded way -- your pat down included patting him down in
21  and around his genital area to make sure there was no weapons
22  or contraband, correct?
23      A.   Yes, sir.
24      Q.   And you did that with respect to Mr. Webb, in other
25  words, you physically patted down his entire clothed area of
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 15

```
 1   the body --

 2        A.   Yes, sir.

 3        Q.   -- to make sure there was no weapons or contraband;

 4   is that correct?

 5        A.   Yes, sir.

 6        Q.   Did you find any weapons or contraband?

 7        A.   No, sir.

 8        Q.   When you conducted the physical search of his body

 9   for contraband or weapons, did you know why he was arrested

10   or what he -- let me rephrase that -- do you know what he had

11   been placed under arrest for?

12        A.   No, sir, not initially.

13        Q.   When did you first find out why he was in custody?

14        A.   I knew it was just a misdemeanor, but I didn't know

15   exactly what the charge was.  I didn't know until after he

16   actually bonded out before I seen the report.

17        Q.   Okay.  So is it your testimony that during your

18   entire person-to-person interaction with Mr. Webb you had no

19   idea why he was in custody of the jail?

20        A.   I mean, just basically what -- what I was told at

21   that time.

22        Q.   What were you told at that time?

23        A.   I am just going by what he said, a sticker.  I

24   mean, it has nothing to -- usually people come in and they

25   try to tell me and I just -- it ain't got nothing to do with
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 16

1    me.   My job is just to, you know, book them in.

2         Q.   Okay.  After you did the search of his body, the

3    pat down that you described --

4         A.   Yes, sir.

5         Q.   -- what happened next?

6         A.   He was escorted to the X-ray machine that's in the

7    sally port, instructed to stand on the footprints, hold his

8    shoes down by his side.  We operate the machine and it X-rays

9    to see if there's anything that maybe was hidden on him that

10   we couldn't see, and after that he was escorted in through

11   the doors.

12        Q.   During the X-ray process that you just testified

13   about, was any contraband or weapons discovered on Mr. Webb?

14        A.   No, sir.

15        Q.   Did -- Deputy Travis English, do you know him?

16        A.   I mean, I've dealt with him when he comes in, but

17   that's about it.  I don't really know him.

18        Q.   On that day, May 5th of 2019, did Deputy English

19   tell you anything about why Mr. Webb had been arrested?

20        A.   No, sir.

21        Q.   Were you present with an individual named Serena

22   Davison?

23        A.   Yes, sir.

24        Q.   Who is Ms. Davison?

25        A.   She was a booking officer as well.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 17

1          MR. GELFAND:  And for the court reporter, that's

2    D-a-v-i-s-o-n.

3    BY MR. GELFAND:

4        Q.    Were you and Ms. Davison working together with

5    respect to Mr. Webb?

6        A.    Yes, sir.

7        Q.    Were you aware that Mr. Webb and Ms. Davison knew

8    each other from high school?

9        A.    That was brought up as I was fingerprinting

10   Mr. Webb.

11       Q.    What was said in particular?

12       A.    I don't really know.  Honestly, I don't remember,

13   but I knew that they knew each other.

14       Q.    After the X-ray what happened?

15       A.    Well, he was escorted then, and he was brought to

16   the change out room, and he was instructed on what to do from

17   there.  He was given a jail uniform and instructed to walk

18   into the -- there's a little dress out room in there, and he

19   just kind of looked at it, and he walked over and he -- he

20   didn't go in it.  I guess it was -- it's really small.  He is

21   kind of a big guy.  And he started putting the clothes on,

22   and I just kind of turned away from him by the door.

23       Q.    Let's back up for a second.

24             Who was present in the room that you brought

25   Mr. Webb to?

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 18

```
 1      A.   Oh, just me and him.

 2      Q.   Was he required, he being Mr. Webb, required to

 3  take off all of the articles of clothing he was wearing when

 4  he was arrested?

 5      A.   Yes, sir.

 6      Q.   And was he required to take off each of these

 7  articles of clothing in your presence?

 8      A.   Not in my presence.

 9      Q.   Were you in the room with him?

10      A.   Yes.

11      Q.   So what do you mean not in your presence?

12      A.   I mean, when someone is arrested for a misdemeanor,

13  they are not required to be strip searched, so that's why

14  there's that little stall in there to be offered.

15      Q.   And so were you physically present in the same room

16  as Mr. Webb when he was required, as you just testified, to

17  take off every article of clothing he had on when he was

18  arrested?

19      A.   Yes.

20      Q.   Were you wearing all of your clothes at the time?

21      A.   Yes.

22      Q.   Was anyone else present?

23      A.   No, sir.

24      Q.   How big is the room?

25           MR. CARSON:  Object to form.
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 19

1    BY MR. GELFAND:

2        Q.   Are you familiar -- I'll rephrase.

3             Are you familiar with the room?

4        A.   Oh, yes, sir.

5             MR. CARSON:  Object to form.

6    BY MR. GELFAND:

7        Q.   You can answer the question.

8        A.   Yes, sir.

9        Q.   How are you familiar with the room?

10       A.   That's where everybody is brought when they first

11   come.

12       Q.   Approximately how many times have you been in that

13   room, sir?

14            MR. CARSON:  Same objection.

15            You can answer.

16   BY MR. GELFAND:

17       Q.   You can answer.

18       A.   Okay.  Hundreds of times probably.

19       Q.   In the hundreds of times that you have been in the

20   room, are you familiar with approximately how large it is?

21            MR. CARSON:  Same objection.

22            THE WITNESS:  Yes, sir.

23   BY MR. GELFAND:

24       Q.   How large is the room?

25            MR. CARSON:  Same objection.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 20

```
 1            You can answer it.
 2            THE WITNESS:  It's probably -- I would say it's
 3       probably like 12 foot -- 12 foot by 12 foot maybe.
 4  BY MR. GELFAND:
 5       Q.   Is it fair to say it's a small room?
 6       A.   Yes, sir, I would probably say.
 7       Q.   How far apart were you from Mr. Webb when he was
 8  naked from head to toe?
 9            MR. CARSON:  Object to form.
10            THE WITNESS:  Probably -- probably about nine to
11       ten foot.  I mean, I stood -- stood at the doorway.
12  BY MR. GELFAND:
13       Q.   Is it your testimony under oath that you were more
14  than two feet away from Mr. Webb when he was changing?
15       A.   Yes, sir.
16       Q.   Did he have to take off all of his clothes
17  including his underwear?
18       A.   Yes, sir.
19       Q.   Why?
20       A.   It's the policy.  They can't have -- they can't
21  have color -- any kind of colored clothes.  So if his
22  underwear would have been colored, he couldn't keep them, so
23  they would have to be solid white.  Solid white underwear,
24  socks, T-shirts, solid white they can keep.
25       Q.   Would you agree with me that requiring him to take
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 21

```
 1  all of his clothes off, including his underwear, was

 2  embarrassing?

 3           MR. CARSON:  Object to form.

 4           THE WITNESS:  I'm sure it is for everybody.

 5  BY MR. GELFAND:

 6      Q.   Would you think it's humiliating?

 7           MR. CARSON:  Same objection.

 8  BY MR. GELFAND:

 9      Q.   You can answer.

10      A.   Yes, sir.

11      Q.   Would you agree with me that it's degrading?

12           MR. CARSON:  Same objection.

13           THE WITNESS:  I mean, I'm sure it would be.  It

14      would be for me.  So yes.

15  BY MR. GELFAND:

16      Q.   Is it fair to say it's not something you would ever

17  want to go through?

18      A.   Sir?  Say that again.

19      Q.   Is it fair to say that that's not -- what Mr. Webb

20  had to go through is not something you would ever want to go

21  through?

22      A.   Yes, sir.

23      Q.   Why wouldn't you want to go through it yourself?

24      A.   I mean, you just said it.  It's -- it would be

25  embarrassing and degrading, so, I mean, I understand that
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 22

```
 1  part.

 2      Q.   Do you think it would be more embarrassing and

 3  degrading if the reason you had to do it was because you said

 4  something?

 5          MR. CARSON:  Object to form.

 6          THE WITNESS:  I mean, I guess.  I mean, I'm not

 7      sure.

 8  BY MR. GELFAND:

 9      Q.   I want to show you what's been marked as exhibit --

10  I believe it's 52.

11          Do you have that in front of you, sir?

12      A.   Yes, sir.

13      Q.   Have you had a chance to review and look at 52

14  prior to testifying?

15      A.   Yes, sir.

16      Q.   Generally speaking, do you recognize these

17  documents?

18      A.   Yes, sir.

19      Q.   Are you familiar with these kinds of documents in

20  your capacity as a -- as working in the Columbia County

21  detention center for as many years as you did?

22      A.   Yes, sir.

23      Q.   Okay.  Are all of these documents associated with

24  Dillon Webb?

25      A.   Yes, sir, they appear to be.
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

                                                                Page 23

 1      Q.    I want to ask you to look at Dillon -- I am sorry

 2   -- at Exhibit 52.

 3            Do you see the first page where it says, Inmate

 4   name, Dillon Webb?

 5      A.    Yes, sir.

 6      Q.    The inventory, does this refer to the belt, a pair

 7   of earrings, and then pants, a shirt, shoes, in other words,

 8   the clothing that was taken from him when he was required to

 9   strip naked and put on other clothing?

10            MR. CARSON:   Object to form.

11            THE WITNESS:   This is the property sheet.  It's

12       what's done in the sally port area.

13   BY MR. GELFAND:

14      Q.    The next page if you look at where it's labeled on

15   the bottom for Bates numbers CCSO-Webb 48, do you see that?

16            MR. CARSON:   The numbers at the bottom.

17            THE WITNESS:   Okay.  Yes, sir.

18   BY MR. GELFAND:

19      Q.    This refers to booking information.

20            Can you just describe in general what this refers

21   to?

22      A.    Yes.  This is what I would call a face sheet, which

23   is basically it has got his picture, his contact information.

24      Q.    Are you familiar with the term mug shot?

25      A.    Yes, sir.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 24

1      Q.    Does this display a mug shot of Dillon Webb?

2      A.    Yes, sir.

3      Q.    Was this mug shot taken on the date that he was

4   arrested and the approximate time where it says, Booked,

5   7:15 p.m.?

6      A.    Yes, sir.

7      Q.    Are you familiar with that process?

8      A.    Yes, sir.

9      Q.    Do you have any idea how it is that the mug shot

10  was published throughout the universe on the Internet?

11          MR. CARSON:  Object to form.

12          THE WITNESS:  Well, the only thing I can say is it

13      automatically puts it to the sheriff's office website.

14      I don't know how it does that or why it does that.

15  BY MR. GELFAND:

16     Q.    So it's your testimony under oath, sir, that the

17  Columbia County Sheriff's Office automatically publishes mug

18  shots, including the mug shot of Dillon Webb?

19     A.    Yes, sir, it's on their website.  It's public

20  record.

21     Q.    Do you see where it says, Searched by Austin Justin

22  Dampier?

23     A.    Yes, sir.

24     Q.    What does that refer to?

25     A.    The initial pat search when he first arrived.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 25

1        Q.   And that is the search that you testified where you

2   physically contact his whole body, including his genital

3   area?

4        A.   Yes, sir.

5        Q.   Do you see the next page with Bates Number 49 at

6   the bottom where it refers to a bond of approximately 2,500

7   total?

8        A.   Yes, sir.

9        Q.   Does that reference what Mr. Webb had to post to

10  get out of jail?

11       A.   Correct.

12       Q.   Had Mr. Webb not posted $2,500, would it have been

13  the policy of the jail to keep him behind bars for longer

14  than he was?

15       A.   He would go to first appearance in the morning and

16  see the judge, and that would have been up to the judge.

17       Q.   So he would have had to spend the night in jail and

18  then the judge would have made a decision?

19       A.   Yes, sir.

20       Q.   Do you see where it says on the next page, page 50,

21  LEO bond, 2,500, and it says, Any?

22       A.   No, I don't.

23       Q.   The bottom of the page, the LEO bond with a bond

24  amount of 2,500.

25       A.   Okay.  Yes, sir, I see it now.

Page 26

1      Q.    Do you know what that referred to?

2      A.    That's the bond that was set by the arresting

3    officer.

4      Q.    Let's talk about that for a second.

5            This bond of 2,500, who set that in this particular

6    case?

7      A.    I guess Deputy English.

8      Q.    Do you have any idea how it is Deputy English came

9    up with $2,500 for Mr. Webb?

10     A.    There is a -- there was a bond.  I don't know what

11   -- I can't remember what the exact term of it is.  There is a

12   paper that basically states what a bond would be until -- you

13   know, if an arresting officer made the arrest until first

14   appearance.

15     Q.    Did Deputy English have the discretion to make that

16   number a lower or higher number if he wanted to?

17     A.    That I am not sure.

18     Q.    Would it be your testimony that the only person to

19   set that bond was Deputy English?

20     A.    Yes, sir.

21     Q.    Now, if you look at page 52 going a couple of pages

22   later, do you see that?

23     A.    Yes, sir.

24     Q.    What is a release sheet?

25     A.    This is just basically saying that he is being

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 27

```
1   released, he posted his bond, and then he signs it, and then

2   the releasing officer signs it, and that just clears him out

3   of the system saying that he is not no longer incarcerated in

4   the jail.

5        Q.   Based on this document, did it appear that Mr. Webb

6   had to pay the jail money to get out of jail on May 5th of

7   2019?

8        A.   He paid a bondsman and the bondsman posted the

9   bond, so I guess yes.

10       Q.   What are you basing the fact that he paid a

11  bondsman on?

12       A.   Well, I have got a copy of the bond, so it says he

13  paid $250 to get out, you know, ten percent.

14       Q.   Based on your understanding of corrections, is it

15  fair to say he doesn't get that money back?

16       A.   Honestly, I don't know.  I don't know that part of

17  it.

18       Q.   Okay.  And let's look at the next page, 53.

19            Do you see where the Columbia County Jail issued an

20  invoice to Mr. Webb?

21       A.   Yes, sir.

22       Q.   And how much was that invoice for?

23       A.   $15.

24       Q.   What was that for?

25       A.   That's -- that's what someone's charged when they
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 28

1   come in.   That's a booking fee.

2        Q.   What do you -- what is somebody paying a booking

3   fee for?

4            Let me rephrase that.   What did Mr. Webb have to

5   pay $15 for the jail to do?

6        A.   I mean, that's -- as far as ever since I've worked

7   there, every time someone comes in there, that's just what

8   they are charged, $15.   I am assuming it's for fingerprints

9   and -- I am assuming.   I don't know.

10       Q.   Is it your opinion that Mr. Webb wanted to be in

11  jail that day and was willing to pay 15 bucks, among other

12  expenses, for it?

13       A.   I doubt anybody wants to come to jail and pay $15.

14       Q.   Did he pay the $15?

15       A.   As far as I know, no.   I mean, once they -- once he

16  walks out, that has nothing to do with me, the booking

17  department, after he leaves.

18       Q.   Do you see where it says Statement of Rights on

19  page -- page Number 55 at the bottom?

20       A.   Yes, sir.

21       Q.   What is this form for?

22       A.   This is something that is when we do the booking

23  process, the paperwork, we go through it and we have them

24  read it and they sign it, and it's mainly for the judge and

25  the attorney in the morning for first appearance.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 29

```
 1      Q.    Did Mr. Webb sign this on the 5th of May of 2019?

 2      A.    It looks like he did, yes, sir.

 3      Q.    Do you see where it says Statement of Rights, and

 4  it says, I understand that I have the following rights?

 5      A.    Yes, sir.

 6      Q.    It says, I have the right to remain silent.

 7            Do you see that?

 8      A.    Yes, sir.

 9      Q.    As a trained law enforcement officer in Columbia

10  County for the sheriff's office, do you agree that people in

11  custody have the right to remain silent?

12            MR. CARSON:  Object to form.

13            THE WITNESS:  Yes, sir.

14  BY MR. GELFAND:

15      Q.    Is it fair to say that law enforcement officers are

16  trained on the Fifth Amendment and Miranda rights?

17      A.    Yes, sir.

18      Q.    And is that part of training before you become a

19  sworn Columbia County Sheriff's Office deputy?

20      A.    Correct.

21      Q.    Do you see where it says later that anything I say

22  can and will be used against me in a court of law?

23      A.    Yes, sir.

24      Q.    Are these are commonly referred to as Miranda

25  rights?
```

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 30

1      A.    I would guess so, yes, sir.

2      Q.    Do you see where it says under subsection 1, My

3    refusal to answer questions or make statements cannot be used

4    against me in court?

5      A.    Yes, sir.

6      Q.    Based on your training and your experience as a

7    Columbia County Sheriff's Office deputy, is it your

8    understanding that somebody in custody can be penalized in

9    any way, shape or form for refusing to answer questions or

10   making statements to a cop?

11           MR. CARSON:  Object to form.

12           THE WITNESS:  No, sir.

13   BY MR. GELFAND:

14     Q.    That would be clearly unconstitutional, correct?

15           MR. CARSON:  Object to form.

16           THE WITNESS:  Correct.

17   BY MR. GELFAND:

18     Q.    And did you receive training on that prior to

19   becoming a Columbia County Sheriff's Office employee?

20           MR. CARSON:  Object to form.

21           THE WITNESS:  I mean, I -- prior to that, no, I

22      didn't -- I didn't go through the police academy until

23      right before I left the Columbia County Sheriff's

24      Office.

25   BY MR. GELFAND:

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 31

1      Q.    Let me ask, the police academy that you went to, is

2  that a standard Florida training based on what you know?

3      A.    Oh, yes, sir.

4      Q.    Okay.  Is it covered in the police academy, in your

5  experience, that a law enforcement officer cannot punish

6  somebody in custody in any way, shape or form for refusing to

7  make a statement?

8      A.    Correct.

9      Q.    And I'm sorry.  When did you complete the police

10 academy approximately?

11     A.    My graduation date was in July of 2019.

12     Q.    Do you see on the last page of this where it says

13 56, Bates Number 56?

14           Do you recognize whose handwriting that is?

15     A.    Yes, sir.

16     Q.    Whose handwriting is that?

17     A.    That would be Detention Deputy Davison.

18     Q.    Are you familiar with Ms. Davison's handwriting

19 just based on working with her on a daily basis?

20     A.    Yes, sir.

21     Q.    Do you see where it says that Sheila Mathews is the

22 emergency contact, the mother of Dillon Webb?

23     A.    Yes, sir.

24     Q.    What does it say next to criminal history?

25     A.    Oh, not applicable.  NA.

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 32

1       Q.    Meaning Mr. Webb had no criminal history?

2       A.    Correct.

3       Q.    And when it says the subject of prior criminal

4   convictions, am I accurate in reading this form that this

5   references that Mr. Webb never had any criminal convictions?

6       A.    Correct.

7       Q.    Other than what we have discussed today, that the

8   -- I am sorry, Officer Dampier -- have you -- did you have

9   any other discussions or physical interactions with Mr. Webb

10  on May 5th of 2019?

11      A.    No, sir.  The only thing I told him was how to use

12  the phone to dial out.

13      Q.    For what purpose?

14      A.    He mentioned he was going to call someone, so I

15  showed him how to use the phone, and that's -- that's about

16  it.

17      Q.    Was it your understanding that he had to contact an

18  attorney because he was arrested?

19      A.    That's whatever he uses the phone for.  That's

20  between him and whoever he calls, I mean, so --

21      Q.    Well, is an inmate in your custody permitted to

22  just call whoever they want?

23      A.    As long as they collect the collect call.

24  Initially when someone comes in it's a collect call.

25      Q.    Approximately how long was Mr. Webb in the custody

Page 33

1  of the jail from the moment Deputy English brought him in to

2  the moment he was released?

3      A.    Not very long.  Probably maybe a little over an

4  hour, hour and 20 minutes or something like that.

5      Q.    You used the phrase not very long.

6            Would you agree with me that even an hour or two in

7  custody would be an undesirable experience?

8      A.    I'm sure.

9      Q.    Have you ever been an inmate in the jail?

10     A.    I have not.

11     Q.    Would you want to be?

12     A.    I have no desire to be.

13     Q.    Why not?

14     A.    I mean, like you said before, it's -- it would be

15  embarrassing and degrading, I mean.

16     Q.    If we can just take -- well, first of all, since

17  that day have you had any interactions with Mr. Webb?

18     A.    No, sir.

19            MR. GELFAND:  Okay.  If we can just take a

20        two-minute recess?

21            MR. CARSON:  Yes.

22            MR. GELFAND:  I think I've about asked all my

23        questions for this witness.

24            (Recess.)

25            MR. GELFAND:  Officer Dampier, I have no further

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 34

1    questions for you.

2        Your attorney may have some questions for you.

3        MR. CARSON:  I do not.  And he will read if it's

4    ordered.

5        (The deposition was concluded at 12:50 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 35

1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA :

4   COUNTY OF COLUMBIA:

5

6            I, Carol Day, CSR, RPR, Court Reporter and Notary

7   Public, State of Florida, certify that AUSTIN JOSEPH DAMPIER,

8   who is personally known by me, appeared before me and was

9   duly sworn on November 5, 2020.

10

11           WITNESS my hand and official seal this 19th day

12  of November 2020.

13

14

15

16

17

18           _____
                CAROL DAY, CSR, RPR
19              CSR NO.:  13768
                Notary Public - State of Florida
20              Commission No:  GG 330952
                Expires:  September 3, 2023
21

22

23

24

25

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 36

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA :

4    COUNTY OF COLUMBIA:

5

6            I, CAROL DAY, CSR, RPR, Court Reporter, certify

7    that I was authorized to and did stenographically report the

8    foregoing proceedings; that a review of the transcript was

9    requested; and that the transcript is a true and complete

10   record of my stenographic notes.

11

12           I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties, nor am

14   I a relative or employee of any of the parties' attorney or

15   counsel connected with the action, nor am I financially

16   interested in the action.

17

18           DATED this 19th day of November 2020.

19

20

21   _____

22   CAROL DAY, CSR, RPR
     CSR NO.:  13768
     Court Reporter

23

24

25

DILLON S. WEBB vs TRAVIS M. ENGLISH
Officer Austin Dampier - 11/05/2020

Page 37

1  DILLON S. WEBB,

2           Plaintiff,

3  vs.

4  TRAVIS M. ENGLISH, et al,

5           Defendants.
                          /

6

7  IN RE:  Deposition of OFFICER AUSTIN DAMPIER

8  TAKEN:  November 5, 2020

9  DATE SENT TO ATTORNEY:  November 19, 2020

10          The above-referenced transcript has been completed
   and awaits reading and signing.
11
            Please direct your client/witness to call our
12 office, 855-850-7038, to review a copy of the transcript and
   note any corrections on the attached errata sheet within 30
13 days or before the date of trial.  Once the errata sheet has
   been completed, please forward it to Third Circuit Reporters
14 & Video, 136 Southwest Nassau Street, Lake City, Florida,
   32025.  Once received, it will be forwarded to all ordering
15 parties.

16          Thank you.

17 cc:  Andrew M. Bonderud, Esquire
        Justin K. Gelfand, Esquire
18      Ian T. Murphy, Esquire
        Matthew J. Carson, Esquire
19

20

21

22

23

24

25