## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

DILLON S. WEBB,

       Plaintiff,

v.                                                        Case No.   3:19-cv-975-MMH-JBT

TRAVIS M. ENGLISH, MARK A.
HUNTER, Sheriff, and CHAD
KIRBY,

       Defendants.

_____

# <u>O R D E R</u>

**THIS CAUSE** is before the Court on Defendants' Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 57; Defendants' Motion) and Plaintiff's Motion for Partial Summary Judgment (Doc. 58; Webb's Motion), both filed on December 7, 2020. On December 21, 2020, Plaintiff filed a response in opposition to Defendants' Motion, <u>see</u> Plaintiff's Amended Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 61; Webb's Response), and Defendants filed a response to Plaintiff's Motion, <u>see</u> Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 62; Defendants' Response). In addition, the Court held two hearings in this case, one on August

23, 2021, and a second on September 21, 2021, both of which addressed aspects of the pending motions. Accordingly, this matter is ripe for review.

## I.    Pertinent Factual Background

On May 5, 2019, Plaintiff, Dillon S. Webb, was driving his vehicle in Columbia County, Florida. Deposition of Dillon S. Webb (Doc. 58-6; Webb Dep.) at 28, 38.[1] Affixed to the rear glass window of the vehicle was a sticker with the words "I EAT A**" in large, white letters (the "Sticker") (Doc. 56-2).[2] Defendant Travis M. English, a deputy with the Columbia County Sheriff's Office (CCSO), pulled up behind Webb at a stoplight and noticed the Sticker. Dashcam Video of Subject Traffic Stop (Doc. 56-1; the Video) at 0:00:05-0:01:00. He stopped Webb's vehicle because he believed the Sticker was obscene in violation of Florida Statutes section 847.011.[3] Deposition of Travis English (Doc. 58-4;

---

[1] Any citation to a page of a deposition will refer to the pagination assigned by the court reporter in the transcript—not the CM/ECF page number—unless otherwise indicated by the Court.

[2] While the Court uses asterisks in this Order in place of the letter "s", the Sticker spelled out the word in full.

[3] Section 847.011(2) makes it a misdemeanor offense to possess "any sticker, decal emblem or other device attached to a motor vehicle containing obscene descriptions, photographs, or depictions . . . ."

Florida law further defines "obscene" as material which
> (a) The average person, applying contemporary standards, would find, taken as a whole, appeals to the prurient interest;
> (b) Depicts or describes, in a patently offensive way, sexual conduct as specifically defined herein; and
> (c) Taken as a whole, lacks serious literary, artistic, political, or scientific value.

Fla. Stat. § 847.001(10).

English Dep.) at 22, 27, 30-31. After speaking with Webb, Deputy English returned to his patrol vehicle to run Webb's information. Video at 0:02:58.

When he returned to Webb's vehicle, Deputy English asked Webb to step out and consent to a pat-down search of his person. Id. at 0:30:10-0:30:20. Webb consented and Deputy English performed the pat-down search. Id. at 0:30:22-0:30:32. Deputy English then explained his reason for the traffic stop and issued Webb a notice to appear,[4] which Webb signed. Id. at 0:30:35-0:32:00.

After issuing the notice to appear, Deputy English directed Webb to remove a letter from the Sticker so that it would no longer be obscene. Id. at 0:32:00-0:32:04. Webb refused, citing his right to free speech under the First Amendment to the United States Constitution. Id. at 0:32:04-0:32:14. Deputy English returned to his patrol vehicle and called his supervisor, Defendant Chad Kirby, a Corporal with CCSO. Id. at 0:32:15-0:38:05. The two discussed section 847.011, whether Webb's Sticker violated the obscenity law, and whether Webb's refusal to remove a letter from the Sticker constituted a separate offense of resisting without violence.[5] Id. Deputy English also asked for clarification on how to convert a notice to appear to an arrest report. Id.

---

[4] A notice to appear is "a written order issued by a law enforcement office in lieu of physical arrest requiring a person accused of violating the law to appear in a designated court or governmental office at a specified date and time." Fla. R. Crim. P. 3.125(a).

[5] Under section 843.02, Florida Statutes, "[w]hoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree . . . ."

Corporal Kirby told Deputy English to write in his report that he had given Webb the Notice to Appear with the understanding that Webb would alter the Sticker. English Dep. at 57-59; Deposition of Chad Kirby (Doc. 58-7; Kirby Dep.) at 34-38. However, Deputy English did not make that notation in his report. English Dep. at 58. Nevertheless, the conversation concluded with Corporal Kirby and Deputy English in agreement that the proper course of action was to arrest Webb and tow his vehicle. Kirby Dep. at 34-38.

Deputy English arrested Webb and placed him in the patrol vehicle. Video at 0:38:10-0:38:54. Deputy English then performed a search of the vehicle, which revealed no contraband. Id. at 0:46:16-1:11:33; English Dep. at 72. A tow truck removed the vehicle from the scene and towed it a short distance to a parking lot where Webb's mother, Corporal Kirby, and the tow truck driver resolved to have the vehicle released to her for $225.00. Deposition of Shellie Matthews (Doc. 58-10; Matthews Dep.) at 15-19. Meanwhile, Deputy English transported Webb to the Columbia County Detention Facility (the Jail) where he was booked by Austin Dampier, a CCSO booking officer.[6] Deposition of Officer Austin Dampier (Doc. 58-12; Dampier Dep.) at 8, 11-12. Among other things, Officer Dampier performed a thorough pat-down search of Webb and

---

[6] Officer Dampier was formerly named as a Defendant in this case. (Doc. 40). However, at the parties' request, the Court dismissed the claims against him with prejudice and terminated him from this action. (Docs. 53, 54).

was present when Webb was required to strip naked and put on the clothes provided by the Jail. Id. at 13-15, 17-20.

CCSO Officers placed Webb in a cell while his mother worked with a bail bondsman to secure his release. Webb Dep. at 48-50. Although the exact length of time Webb spent in the Jail is in dispute, suffice it to say Webb was incarcerated for more than an hour. See, e.g., id. at 49, 50. Webb paid approximately $225.00 to retrieve his truck from the tow company,[7] $250.00 to the bail bondsman, and a $15.00 Jail fee. Webb Dep. at 58-59; Dampier Dep. at 27. Webb also suffered emotional distress and embarrassment during and following his arrest. Webb Dep. at 53-58. The State Attorney's Office for the Third Judicial Circuit ultimately determined Webb had a valid defense to the charges under the First Amendment and, as such, dropped the charges against him. (Doc. 58-13).

On August 21, 2019, Webb initiated this lawsuit against the individual officers involved in his arrest and booking,[8] as well as Columbia County Sheriff Mark A. Hunter (the Sheriff). (Doc. 1). In his operative Second Amended Complaint (Doc. 40; Complaint), Webb asserts eight claims premised on three

---

[7] There is some dispute over the amount of the fee paid by Webb. Webb testified it was $225.00 whereas his mother testified she received a fraction of the amount from Corporal Kirby. Compare Webb Dep. at 58 with Matthews Dep. at 16-17.

[8] When he filed suit, Webb was unaware of the identity of Corporal Kirby and Officer Dampier. (Doc. 1 ¶¶ 3-4). After he learned their identities in discovery, Webb added them as parties to the case. (Doc. 39).

distinct theories: (1) a violation of Webb's First Amendment right, Count I; (2) violations of Webb's Fourth Amendment rights, Counts II through V; and (3) municipal and supervisory liability against the Sheriff, Counts VI through VIII. The parties' cross-motions for summary judgment address these claims.

## II.    Legal Standard

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[9] An issue is genuine when the evidence is such

---

[9] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

that a reasonable jury could return a verdict in favor of the nonmovant. <u>See</u> <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>McCormick v. City of Ft. Lauderdale</u>, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual

dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). Notably, the instant action is before the Court on cross-motions seeking summary judgment. "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). Instead, applying the same principles, "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts."

## III.  Discussion

In his Complaint, Webb asserts the following eight claims: Count I – First Amendment Retaliation; Count II – Unlawful Terry Stop; Count III – Unlawful Search; Count IV – Unlawful Arrest; Count V – Deprivation of Fourth Amendment Rights; Count VI – "Government Entity Liability"; Count VII – "Government Entity Liability for Failure to Train"; Count VIII – "Supervisor Liability." See generally Complaint.  In Webb's Motion, he asks the Court to enter partial summary judgment on the issue of liability as to all eight claims and set the matter for trial on the issue of damages. See generally Webb's

Motion. In Defendants' Motion, Defendants seek the entry of summary judgment in full in their favor. See generally Defendants' Motion.

Before addressing the merits of the parties' respective arguments as to each of Webb's claims, the Court must clarify which claims are properly stated and eliminate unnecessary claims that are redundant and risk confusing a jury. First, the Court notes that Webb has sued Deputy English and Corporal Kirby in their individual and official capacities. Complaint ¶¶ 2-3. The purpose of suing a government official in his or her individual capacity is to impose personal liability for actions taken under color of state law. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1115 (11th Cir. 2005) (quoting Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)). Suing a government official in an official capacity, on the other hand, is an alternative way to assert a claim against the entity he or she represents, which in this case would be the Sheriff, or more appropriately as discussed below, the County. Id. Since Webb also brought the same claims against the Sheriff in his official and supervisory capacity, the official-capacity suits against Deputy English and Corporal Kirby are duplicative and should not be allowed to proceed. See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (affirming directed verdict in favor of officers in their official capacities where the municipality was also a named defendant in order to avoid redundancy and confusing the jury); see also C.P. by and through Perez v. Collier Cnty., 145 F. Supp. 3d 1085, 1091 (M.D.

Fla. 2015) (dismissing similar claims). For this reason, the Court will dismiss the claims in Counts I-V to the extent they are brought against Deputy English and Corporal Kirby in their official capacity. These claims will proceed against these defendants (the Individual Defendants) in their individual capacity only.

Next, the Court notes that Webb has named Sheriff Hunter, in his official capacity, as a Defendant in each of the eight claims set forth in the Complaint. See generally Complaint. As noted above, in Counts I through V, in addition to suing the Individual Defendants for violating his First and Fourth Amendment rights in various ways, Webb also seeks to hold Sheriff Hunter liable for their actions. But Webb asserts three other claims in Counts VI, VII, and VIII against Sheriff Hunter that are indistinguishable and seek the same relief. Id. at 24-29. Specifically, in Count VI, which Webb titles as a claim for "Government Entity Liability," he asserts that Sheriff Hunter is liable for Deputy English and Corporal Kirby's actions because "CCSO's official policy or custom was the moving force behind Webb's injuries." Id. at 24. Similarly, in Count VII, which he titles as a claim for "Government Entity Liability for Failure to Train and Supervise," he seeks to impose liability on Sheriff Hunter based on various training deficiencies which he alleges caused his injuries. Id. at 26-27. And in Count VIII, Webb asserts what he labels as a claim for "Supervisor Liability Against Sheriff Hunter." Id. at 27-29. For the following reasons, the Court finds that the claims against Sheriff Hunter in his official capacity in Counts I-V are

redundant of the claims in Counts VI and VII, and therefore, due to be dismissed. The Court further finds that the claim in Count VIII is due to be dismissed as it fails to state a claim on which relief can be granted.

"'For liability purposes, a suit against a public official in his official capacity is considered a suit against the local governmental entity he represents.'" Vineyard v. Cnty. of Murray, Ga., 990 F.2d 1207, 1210 n.3 (11th Cir. 1993) (citation omitted), cert. denied, 510 U.S. 1024 (1993). Therefore, Webb's claims against Sheriff Hunter in his official capacity are municipal liability claims. Indeed, by naming Sheriff Hunter, in his official capacity, in Counts I-V, Webb is simply pleading claims of municipal liability (against the government entity he represents – the county) for the actions of Deputy English and Corporal Kirby. Cook, 402 F.3d at 1115. But in Counts VI and VII, Webb specifically pleads those very same claims of municipal liability. As such, to the extent Sheriff Hunter, in his official capacity, is named as a Defendant in Counts I through V, these claims are redundant of the claims in Counts VI and VII, and therefore, due to be dismissed.

The claim in Count VIII is also due to be dismissed. As noted, Count VIII purports to be a claim for "Supervisor Liability." However,

> supervisory liability under § 1983 "must be based on something more than the theory of respondeat superior." Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998). "[A]bsent allegations of personal participation … supervisory liability is permissible only if there is a causal connection between

> a supervisor's actions and the alleged constitutional violation."
> Piazza v. Jefferson County, 923 F.3d 947, 957 (11th Cir. 2019)
> (quotation marks omitted).

Henley v. Payne, 945 F.3d 1320, 1331 (11th Cir. 2019). Indeed, the Supreme Court of the United States has soundly rejected the theory of respondeat superior as a basis for liability in 42 U.S.C. § 1983 actions. See Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658 (1978). Instead, a county or municipality may be liable in a § 1983 action "only where the municipality itself causes the constitutional violation at issue." Cook, 402 F.3d at 1115 (emphasis in original) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the municipality was the "moving force" behind the alleged constitutional deprivation. See Monell, 436 U.S. at 693-94. To the extent Webb's claim in Count VIII is based on a theory of supervisory liability it fails altogether as he sets forth no allegation that would support an inference that Sheriff Hunter personally participated in any of the violations of his rights. And to the extent he seeks to pursue a claim of municipal liability for the actions of Deputy English and Corporal Kirby, the claim is indistinguishable from and entirely redundant of the claims in Counts VI and VII.   As such, Count VIII is due to be dismissed.[10]

---

[10] Notably, Webb's briefing on Count VIII fails to explain how he asserts any claim against the Sheriff other than those contained in Counts VI and VII. Instead, he simply reiterates the Monell factors to establish municipal liability under Section 1983 and states in a conclusory fashion that they were met. As such, for the same reasons articulated below, even if Count

The Court will now turn to the merits of the remaining claims – Counts I-V against Deputy English and Corporal Kirby in their individual capacity and Counts VI and VII against Sheriff Hunter in his official capacity. In doing so, the Court begins by addressing Deputy English and Corporal Kirby's arguments related to qualified immunity. See Lee v. Ferraro, 284 F.3d 1188, 1197 n.6 (11th Cir. 2002) (noting "the principle that qualified immunity claims must be assessed by the courts 'as early in the lawsuit as possible.'").

## A. Qualified Immunity

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[11]   Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); Carr v. Tatangelo,

---

VIII were not dismissed, it would fail as a matter of law and judgment in favor of the Sheriff as to Count VIII would be appropriate.

[11]  In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then consider "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee, 284 F.3d at 1200 (quoting Marsh v. Butler Cnty., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, a defendant bears the initial burden of showing that his conduct was within the scope of his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007); Lee, 284 F.3d at 1194. Here, it is undisputed that, at all times material to this case, Deputy English and Corporal Kirby were acting in their official capacity and within the scope of their discretionary authority.[12]   Accordingly, the burden shifts to Webb to demonstrate that qualified immunity is not appropriate using the test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a

---

[12] "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority.'" Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. See Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004); see also Lee, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which she was arrested).

constitutional right?" Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott, 550 U.S. 372, 377 (2007)). The court must also ask whether the right allegedly violated was clearly established at the time of the violation.   Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, ---F.4th---, 2021 WL 3923153, at *7 (11th Cir. Sept. 2, 2021) ("we ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct") (internal quotations omitted).   The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009)[13]; Underwood, 2021 WL 3923153, at *7.

### i.   First and Fourth Amendment Unlawful Arrest Claims

Webb asserts two distinct claims arising from his May 5, 2019 arrest. In Count I, Webb asserts that Deputy English and Corporal Kirby violated his First Amendment rights when they arrested him for displaying and refusing to alter the Sticker. And in Count IV, he asserts that these Defendants violated his Fourth Amendment right not to be arrested in the absence of probable cause.

---

[13] In Pearson, the Supreme Court modified the procedure mandated in Saucier permitting courts the discretion to determine which prong of the qualified immunity analysis should be resolved first. See Pearson, 555 U.S. at 236.

The existence, or non-existence, of probable cause to believe Webb was violating Florida's obscenity statute, section 847.011, is central to both of Webb's claims. This is so because with the exception of a narrow set of specifically recognized circumstances, the existence of probable cause bars a claim for First Amendment retaliation based upon an arrest. See Nieves v. Bartlett, ___ U.S. ___, 139 S.Ct. 1715, 1723-27 (2019). Similarly, while a warrantless arrest without probable cause violates the Constitution and can give rise to § 1983 liability for false arrest, the existence of probable cause at the time of the arrest constitutes a complete defense to a Fourth Amendment false arrest claim. See Hardigree v. Lofton, 992 F.3d 1216, 1229-30 (11th Cir. 2021); see also Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004), abrogated on other grounds by Williams v. Aguirre, 965 F.3d 1147, 1159 (11th Cir. 2020).

The Eleventh Circuit instructs that

> For probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances. This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

Lee, 284 F.3d at 1195 (quotation and internal quotation marks and citation omitted). However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown v. City of

Huntsville, 608 F.3d 724, 734 (11th Cir. 2010); Gates v. Khokhar, 884 F.3d 1290, 1298 (11th Cir. 2018), cert. denied, __ U.S. __, 139 S.Ct. 807 (2019). Accordingly, the dispositive question for qualified immunity purposes "is not whether actual probable cause existed; rather, the question is whether the officer had 'arguable' probable cause." Carter v. Gore, 557 F. App'x 904, 908 (11th Cir. 2014). "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant [ ] could have believed that probable cause existed to arrest.'" Lee, 284 F.3d at 1195 (quotation omitted). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007).

Because the Individual Defendants have asserted the defense of qualified immunity, the Court must determine whether Deputy English and Corporal Kirby's decision to arrest Webb was supported by arguable probable cause. In making this determination, the Court considers the language of Webb's Sticker and the totality of the circumstances within the officers' knowledge. As an initial matter, it is undisputed that Deputy English and Corporal Kirby subjectively interpreted the Sticker as depicting a sexual act and believed that the Sticker violated Florida's obscenity statute. English Dep. at 22, 27, 30-31,

66-67; Kirby Dep. at 17, 19, 32, 49.[14] While Webb denies the Sticker was in fact obscene, in interviews he repeatedly acknowledged the sexual nature of his Sticker,[15] albeit couched as an attempt at humor,[16] showing that the notion that an erotic message was more than hypothetical—it could reasonably be viewed as the predominant message being communicated. Indeed, others in the videos similarly acknowledged, both directly and indirectly, that the Sticker described a sexual act. Given this evidence, including Webb's own statements, it is beyond dispute that reasonable officers possessing the same knowledge as Deputy English and Corporal Kirby could have thought the Sticker depicted a sexual act, and as such arguably violated Florida Statute section 847.011(2).

If the Sticker depicted a sexual act, it would be protected speech under the First Amendment only if it had serious literary, artistic, political, or scientific value. See Miller v. California, 413 U.S. 15, 24 (1973); Fla. Stat. 847.001(10). However, in such an instance, Deputy English and Corporal Kirby had to make a value judgment on whether the Sticker had such serious literary,

---

[14] See also Declaration of Deputy Travis English (Doc. 56-13; English Decl.) ¶¶ 6-8; Declaration of Cpl. Chad Kirby (Doc. 56-14; Kirby Decl.) ¶¶ 6-8.

[15] Webb either insinuated or directly acknowledged the sexual nature of the Sticker in videos titled "Interview with the Florida Man Who was Arrested for Refusing to Remove an 'I EAT A\*\*' Decal" (Doc. 56-9; Sean Z Video); "Getting Arrested for a Sticker on His Car" (Doc. 56-10; VICE Video); "Web Redemption Wednesday – I Eat A\*\*" (Doc. 56-11; Tosh.0 Video); and "CRAZY INTERVIEW WITH DYLAN WEBB" (Doc. 56-12; Donnydoesthings Video).

[16] The Court notes there is no inherent conflict between Webb's intention to elicit laughter with his Sticker and it being obscene. Cf. Cohen v. California, 403 U.S. 15, 25 (1971) ("[I]t is nevertheless often true that one man's vulgarity is another's lyric."). The two are not mutually exclusive and Webb's suggestion that his intent to bring about laughter forecloses any argument that the Sticker was obscene is unsupported by case law.

artistic, political or scientific value in deciding whether to arrest Webb. Notably, the Eleventh Circuit has recognized that value judgments are inherently difficult to review, see Luke Records, Inc. v. Navarro, 960 F.2d 134, 137 (11th Cir. 1992) ("It is difficult for an appellate court to review value judgments."), which is why law enforcement officers are immune from suit if their value judgments are supported by arguable probable cause. See Skop, 485 F.3d at 1137. Indeed, the Eleventh Circuit has noted that "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context." Gaines v. Wardynski, 871 F.3d 1203, 1210 (2017) (collecting cases). Here, Deputy English and Corporal Kirby's determination that the Sticker lacked serious value under Florida law was not inherently unreasonable under the circumstances.[17] As such, the Court finds reasonable officers in the same circumstances and with the same knowledge as Deputy English and Corporal Kirby could believe Webb's Sticker was obscene, making it an arrestable offense under Florida law.[18] See Fla. Stat. § 847.011.

---

[17] While Webb presents evidence that the phrase is widely used, see Webb's Response at 16-17; Amazon Search Results (Doc. 58-9), such evidence does not mean the phrase has serious literary, artistic, political, or scientific value, see Luke Records, 960 F.2d at 137 (rejecting the notion that the value of a work depends on the acceptance it receives; finding instead expert testimony that a record's music contained oral traditions and musical conventions that had cultural and political significance to be evidence in support of the third Miller element).

[18] The fact that Webb was initially issued a notice to appear does not alter the analysis of whether the arrest was constitutional. Webb has no constitutional right to a notice to appear; it is a state-created alternative to arrest that law enforcement officers "may" provide if certain criteria is established. See Fla. R. Crim. P. 3.125; see also Alston v. City of Darien, 750 F. App'x 825 (11th Cir. 2018) (noting that there is no federal right not to be arrested in violation of state law") (quoting Knight v. Jacobson, 300 F.3d 1272, 1276 (11th Cir. 2002)). Moreover,

Because the Court finds Webb's arrest was arguably justified under Florida's obscenity law, the Court need not separately address his arrest for resisting without violence. <u>Hardigree</u>, 992 F.3d at 1230 ("Arguable probable cause for any offense would bar [plaintiff's] false arrest claim on all charges.") (citing <u>Grider v. City of Auburn</u>, 618 F.3d 1240, 1257 (11th Cir. 2010)). Deputy English and Corporal Kirby are entitled to the protection of qualified immunity as to the false arrest claim in Count IV, and as such, Defendants' Motion is due to be granted, and Webb's Motion is due to be denied as to the claim in Count IV.

The Court turns next to the First Amendment retaliation claim stemming from Webb's arrest. To prevail on a § 1983 claim for retaliation in violation of the First Amendment, Webb must establish that (1) his speech was constitutionally protected; (2) the defendants' retaliatory conduct adversely affected the protected speech – meaning that it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights"; and (3) there was a causal relationship between the adverse conduct and the protected speech. <u>See</u> <u>Castle v. Appalachian Technical Coll.</u>, 631 F.3d 1194, 1197 (11th Cir. 2011); <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250 (11th Cir. 2005).

_____

the Supreme Court has previously upheld law enforcement officers' authority to arrest individuals for minor criminal offenses, even if they typically result in a citation in lieu of arrest. <u>See</u> <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354-55 (2001).

Here, in evaluating the applicability of the doctrine of qualified immunity, the Court need not determine whether genuine issues of fact exist as to the question of whether Deputy English and Corporal Kirby violated Webb's right to be free from First Amendment retaliation because the constitutional rights Webb alleges the Defendants violated were not clearly established at the time of his arrest.[19]  As such, the Individual Defendants are entitled to the protection of qualified immunity for the claim in Count I.

The Court first concludes that even if Webb's speech - his display of, and refusal to alter, the Sticker - was constitutionally protected, the law protecting such speech was not clearly established at the time of his arrest. Indeed, the line protecting such speech remains blurred today. See Cruz v. Ferre, 755 F.2d 1415, 1422 (11th Cir. 1985) (noting that protected expression "is often separated from obscenity only by a dim and uncertain line") (quoting Bantam Books v. Sullivan, 372 U.S. 58, 66 (1963)); see also Ashcroft v. American Civil Liberties Union, 542 U.S. 656, 674-75 (2004), Stevens, J. concurring (noting in the context of criminal prosecutions for obscenity that "the line between communications which offend and those which do not is too blurred to identify criminal conduct").

---

[19] Webb's claim in Count I is premised on two aspects of his First Amendment right - first, that his display of the Sticker was constitutionally protected speech, and second, his right not to be retaliated against for engaging in (or refusing to alter his) constitutionally protected speech.

The Supreme Court has instructed that in order

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Hope, 536 U.S. at 739 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). For purposes of this analysis the critical question is whether the state of the law gave the government actor "fair warning" that his alleged treatment of the plaintiff was unconstitutional. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (quoting Hope, 536 U.S. at 741); see also Marsh, 268 F.3d at 1031 ("[F]air and clear notice to government officials is the cornerstone of qualified immunity."). The Eleventh Circuit recently addressed a plaintiff's burden in demonstrating the existence of clearly established law.

> Under this Court's precedent, a right can be clearly established in one of three ways. A [plaintiff] must point to either (1) "case law with indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or case law," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Lewis [v. City of W. Palm Beach, 561 F.3d 1288, 1291–92 (11th Cir. 2009)]. Although we have recognized that options two and three can suffice, the Supreme Court has warned us not to "define clearly established law at a high level of generality." Plumhoff v. Rickard, 572 U.S. 765, 779, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) (quotation marks omitted). For that reason, the second and third paths are rarely-trod ones. See Gaines v.

> Wardynski, 871 F.3d 1203, 1209 (11th Cir. 2017) (collecting cases). And when a plaintiff relies on a "general rule[ ]" to show that the law is clearly established, it must "appl[y] with obvious clarity to the circumstances." Long v. Slaton, 508 F.3d 576, 584 (11th Cir. 2007) (quotation marks omitted; emphasis added); see also Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010) ("[I]f a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question.").

Crocker v. Beatty, 995 F.3d 1232, 1240 (11th Cir. 2021).

In response to Defendants' invocation of qualified immunity, Webb attempts to show that his constitutional right to display the Sticker with impunity was clearly established by relying on a specific analogous case—i.e., travelling down the first path outlined by the Eleventh Circuit in Crocker. Specifically, citing Baker v. Glover, 776 F. Supp. 1511, 1513 (M.D. Ala. 1991), Webb argues that the constitutionally protected nature of his speech was clearly established because the Sticker merely contained non-obscene, though foul, language. See Webb's Response at 9-11. However, this argument fails for two reasons. First, decisions at the district court level, like the one in Baker, are insufficient to clearly establish the law for purposes of a qualified immunity analysis. Instead, "only decisions of the United States Supreme Court, [the Eleventh Circuit], or the highest court in a state can 'clearly establish' the law." Crocker, 995 F.3d at 1240 (citing Gates, 884 F.3d at 1296); Echols v. Lawton, 913 F.3d 1313, 1324 (11th Cir. 2019) ("We look only to binding precedent at the

time of the challenged conduct – that is the decisions of the Supreme Court, the Eleventh Circuit or the highest court of the state."). Second, the <u>Baker</u> decision is not particularly persuasive because it is distinguishable in important respects. In <u>Baker</u>, the plaintiff had a bumper sticker that read, "How's My Driving? Call 1–800–EAT S\*\*\*!" 776 F. Supp. at 1513. Law enforcement pulled Baker over in Alabama for violating a newly enacted obscenity statute and forced him to scratch out the offending language before allowing him to leave the scene. <u>Id.</u> Baker later sued, arguing that the obscenity statute as applied to his bumper sticker violated his First Amendment rights. <u>Id.</u> Though the defendants in the case went to great lengths to correlate the consumption of feces with a sexual act such that it would constitute obscenity,[20] the trial court rejected the argument noting that it was "unpersuaded that a facetious message employing a single profane word could be viewed as carrying such an abnormal appeal." <u>Id.</u> at 1515. In other words, the <u>Baker</u> court found Baker's "EAT S\*\*\*" bumper sticker was not erotic in nature, and therefore could not be obscene expression falling outside the protection of the First Amendment. <u>Id.</u> The language of Baker's bumper sticker, however, is materially different than the one displayed by Webb such that the <u>Baker</u> decision fails to qualify as "caselaw

---

[20] As recognized by the Supreme Court, obscene expression that is not protected by the First Amendment "must be, in some significant way, erotic." <u>Cohen v. California</u>, 403 U.S. 15, 20 (1971).

with indistinguishable facts." Moreover, in addition to being far from "indistinguishable," Baker involved the application of Alabama's obscenity law—not Florida Statutes section 847.011—which significantly weakens its comparative value for Florida law enforcement officers like Deputy English and Corporal Kirby.

To the extent Webb intends to rely on the two Supreme Court opinions mentioned in passing in his Response or otherwise argue his right was so fundamental that it was clearly established under the two "rarely-trod" paths laid out in Crocker, the Court remains unpersuaded. The first Supreme Court case, Miller v. California, has little in common with this case factually. 413 U.S. 15, 16-17 (1973). Miller involved the mass mailing of explicit marketing brochures for adult materials. Id. While it established the present standard for what can be considered "obscene" for purposes of the First Amendment, it does not define the standard with a level of particularity that would result in Webb's Sticker obviously falling outside the scope of obscenity. Id. at 24 (limiting the type of speech that can be labelled obscene to those "works [1] which, taken as a whole, appeal to the prurient interest in sex, [2] which portray sexual conduct in a patently offensive way, and [3] which, taken as a whole, do not have serious literary, artistic, political, or scientific value."). The second Supreme Court case, Cohen, is equally unhelpful in clearly establishing Webb's constitutional right to display the Sticker without consequence. 403 U.S. at 16-17, 26 (finding a

jacket that read "F*** the Draft" did not implicate obscenity issues because it was not erotic in nature). While these cases could be read to support an argument that the use of expletives is not <u>per</u> <u>se</u> obscene, neither case stands for the proposition that an individual has a clearly established right to display a statement, like the Sticker, that arguably depicts a sexual act without fear of running afoul of state obscenity laws.

Critically, the Court does not have to determine whether Webb's Sticker was in fact obscene for qualified immunity to apply. And, the Court makes no such finding here. Rather, Webb's burden was to show that at the time of his arrest it was clearly established that his Sticker was constitutionally protected speech, i.e. not obscene. The lack of any case even closely on point dooms Webb's effort to make that showing. On this record, the undisputed facts establish the Sticker could be interpreted by the parties and others as describing a sexual act.[21] If interpreted to refer to a sexual act, the Sticker is arguably obscene and unprotected by the First Amendment. The lack of comparable case law and the fact that the obscene nature of the Sticker is debatable is precisely why Webb's argument that he had a clearly established right fails. <u>See</u> <u>Gaines</u>, 871 F.3d at 1210 ("If reasonable people can differ on the lawfulness of a government official's actions despite existing case law, he did not have fair warning and is

---

[21] <u>See</u> note 15, <u>supra</u> (capturing multiple people on video, including Webb, that understood the Sticker referred to a sexual act); <u>see also</u> English Dep. at 25; Kirby Dep. at 17.

entitled to qualified immunity."). Because the constitutionally protected nature of Webb's speech was not clearly established, Deputy English and Corporal Kirby are shielded from suit by qualified immunity as to the retaliatory arrest claim in Count I of the Complaint.

The doctrine of qualified immunity also shields Deputy English and Corporal Kirby from liability for Webb's First Amendment retaliation claim because at the time of Webb's arrest, it was not clearly established "that an officer who had arguable probable cause" to make an arrest "nevertheless could be liable for acting with an unconstitutional motive." Quick v. Geddie, 763 F. App'x 909, 914-15 (11th Cir. 2019); Alston, 750 F. App'x at 835 ("At the time of Alson's arrest, there was no clearly established 'right to be free from a retaliatory arrest that [was] otherwise supported by probable cause.'") (quoting Reichle v. Howards, 566 U.S. 658, 665 (2012)). Rather, on the date of Webb's arrest, May 5, 2019, "the governing law provided that, 'when an officer has arguable probable cause to arrest he is entitled to qualified immunity . . . from First Amendment claims stemming from the arrest.'" Id. (quoting Gates, 884 F.3d at 1298).

On May 28, 2019, the Supreme Court decided Nieves v. Bartlett, ___U.S. ____, 139 S.Ct. 1715 (2019). In Nieves, the Court was called upon to "resolve whether probable cause to make an arrest defeats a claim that the arrest was in retaliation for speech protected by the First Amendment." Id. at 1721. In

doing so, the Court first discussed why its prior decisions left the question open. Id. at 1721-22. It then addressed the causal complexity of First Amendment retaliation claims in which it is difficult to determine whether a government action is the result of an "officer's malice or the plaintiff's potentially criminal conduct." Id. at 1724. Ultimately, the Court concluded that:

> Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose "a risk that some police officers may exploit the arrest power as a means of suppressing speech." Lozman, 585 U.S. at ____, 138 S.Ct. at 1953-1954.
>
> . . .
>
> We conclude that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.

Nieves, 139 S.Ct. at 1727. Despite his citation to, and reliance on it, see Webb's Response at 12-13, the Nieves decision is of no benefit to Webb, because it was decided three weeks after Webb's arrest. As such, as of the date of Webb's arrest, the right to be free from a retaliatory arrest that was otherwise supported by probable cause was not clearly established. See Quick, 763 F. App'x at 914-15; Alston, 750 F. App'x at 835; Turner v. Williams, Case No. 3:19-cv-641-TJC-PDB, 2021 WL 1521137, at *9 (M.D. Fla. Mar. 17, 2021) ("it was not clearly established until Nieves that an officer could be liable for an alleged

retaliatory arrest under these circumstances"); Brienza v. City of Peachtree City, ___ F.Supp.3d. ___, 2021 WL 2930098, at *5 (N.D. Ga. May 3, 2021) ("Prior to Nieves, it had not been clearly established that a retaliatory arrest claim might proceed even if the officer had probable cause to arrest."). To overcome the defense of qualified immunity, a plaintiff must show that the right at issue was clearly established, in other words that "existing precedent … placed the statutory constitutional question beyond debate." Reichle, 566 U.S. at 664 (also noting that courts grant qualified immunity where the right was not established "by prior case law"); McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007) ("The law clearly establishing the violation also must be 'pre-existing'—that is, in effect at the time of the alleged violation."). Thus, Webb cannot prevail by attempting to rely on the narrow exception to the "no probable cause requirement" recognized in Nieves.[22]

At the time of Webb's arrest clearly established law instructed that an officer with arguable probable cause to make an arrest was entitled to the protection of the doctrine of qualified immunity for claims of First Amendment retaliation stemming from such arrest. Gates, 884 F.3d at 1298 (citing Redd v. City of Enterprise, 140 F.3d 1378, 1383-84 (11th Cir. 1998)); Peterson v. Kopp,

---

[22] Notably, even if Nieves assisted Webb, the record is devoid of any evidence of similarly situated individuals much less how officers "typically" handled those instances. And to the extent Webb seeks to rely on Deputy English's subjective motivation because he only decided to arrest Webb after Webb refused to alter the Sticker, Nieves makes clear that an officer's subjective motivation "is simply 'irrelevant.'" Nieves, 139 S.Ct. at 1725, 1727.

754 F.3d 594, 602 (11th Cir. 2014). Because for the reasons set forth above this Court finds that Deputy English and Corporal Kirby had at least arguable probable cause to arrest Webb for violating Florida Statute section 847.011(2), they are entitled to qualified immunity as to Webb's First Amendment retaliation claim. As such Defendants' Motion is due to be granted, and Webb's Motion denied, to the extent that summary judgment is due to be granted in favor of the Individual Defendants as to Count I.

### ii.   Remaining Fourth Amendment Claims

Like his false arrest claim in Count IV, Webb's remaining claims relate to his rights under the Fourth Amendment. Specifically, in Count II, Webb alleges Deputy English unlawfully stopped his vehicle and performed an impermissible pat-down search of Webb when he exited the vehicle; in Count III, Webb alleges Deputy English unreasonably searched his vehicle and his person and seeks to hold both Deputy English and Corporal Kirby responsible for that Fourth Amendment violation; and in Count V, Webb alleges that he was subjected to an unlawful strip search at the Jail. To overcome qualified immunity as to these claims, Webb must show his Fourth Amendment rights were violated and these rights were clearly established. See Williams, 965 F.3d at 1168; Echols, 913 F.3d at 1319. The Court addresses each count in turn.[23]

---

[23] The Court addresses Webb's claims related to the search of his person in its analysis of Counts II and V. As such, in addressing Count III, the Court limits its discussion to the search of Webb's vehicle.

### a. Count II

The Court starts with the constitutionality of Deputy English's pat-down search of Webb at the scene. Webb consented to the pat-down search when he stepped out of his vehicle. Video at 0:30:10-0:30:32. It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); see also Fair v. Mills, 230 F. Supp. 3d 1305, 1310-11 (M.D. Fla. 2017) ("A police officer who searches a person who has consented to that search does not violate a constitutional right."). In light of this, the real claim in Count II[24] is whether Deputy English's Terry[25] stop of Webb was constitutional.

The Supreme Court has held that a law enforcement officer does not violate the Fourth Amendment by conducting a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry, 392 U.S. at 30 (1968)). The reasonable suspicion standard required to justify a Terry stop is "significantly more lenient" than the probable cause standard necessary to support an arrest. Moore v. Pederson, 806 F.3d 1036, 1044 (11th Cir. 2015).

---

[24] In his briefing on Count II, Webb does not devote any argument to disputing the consent issue. See Webb's Response at 17. Instead, he frames Count II as encompassing more than the pat-down search—specifically, the stop itself and the various investigatory steps taken by Deputy English. Id.

[25] Terry v. Ohio, 392 U.S. 1 (1968)

Nevertheless, reasonable suspicion does demand "at least a minimal level of objective justification for making the stop." Wardlow, 528 U.S. at 123. Since qualified immunity has been asserted, however, "the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000).

Here, Webb's argument that Deputy English lacked arguable reasonable suspicion fails. As discussed above, Deputy English observed Webb's Sticker which was arguably obscene as defined by Florida law. See Fla. Stat. § 847.001(10). It naturally follows, then, that Webb's display of the Sticker on his vehicle arguably violated section 847.011(2). Under qualified immunity, an arguably reasonable suspicion that Webb's action violated Florida law, as opposed to an actual violation, is all that is required to insulate Deputy English's decision to stop Webb. Jackson, 206 F.3d at 1166. Because Deputy English interpreted the Sticker as describing a sexual act—an interpretation that, as discussed above, is arguably reasonable based on the plain language of the Sticker and one that was shared by others, the Court finds sufficient reasonable suspicion existed when Deputy English stopped Webb. As such, Deputy English is entitled to qualified immunity as to his claim that the investigatory stop violated Webb's Fourth Amendment rights. Therefore, Defendants' Motion is due to be granted, and Webb's Motion denied, to the

extent that judgment will be entered in favor of Defendant Deputy English as to Count II.

### b. Count III

In Count III, Webb challenges the search of his vehicle following the arrest. To defeat the Defendants' claim to qualified immunity, Webb must show (1) a clearly established right to be free from the type of search conducted and (2) that Deputy English violated that right. See Pearson, 555 U.S. at 243-44 ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment."). It is clearly established that "searches conducted outside the judicial process, without prior approval by judge or magistrate [judge], are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 556 U.S. 332, 338 (2009). The three general exceptions to the prohibition of warrantless searches of a vehicle are: (1) a search incident to a lawful arrest of a recent occupant; (2) a search premised on probable cause that the vehicle contains evidence of criminal activity; and (3) an inventory search. See U.S. v. Alston, 598 F. App'x 730, 733 (11th Cir. 2015) (collecting cases).

Defendants argue that Deputy English conducted a permissible inventory search of the vehicle following Webb's arrest. See Defendants' Motion at 20-21. In evaluating inventory searches, the Court must "determine (1) whether the

police had the authority to impound the vehicle, and (2) whether the officers followed procedures governing inventory searches." U.S. v. Sibert, 779 F. App'x 685, 686-87 (11th Cir. 2019) (citing U.S. v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991)). Typically, law enforcement officers can "impound a vehicle so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity . . . ." U.S. v. Johnson, 777 F.3d 1270, 1277 (11th Cir. 2015) (cleaned up). Such inventory search procedures should be "explicit and comprehensive," because "[w]ithout such procedures, officers are left with no guidance in the performance of a duty which is meant not as an investigatory technique but as a means for safeguarding individuals' possessions and protecting the police from false claims." Williams, 936 F.2d at 1248 (citing Colorado v. Bertine, 479 U.S. 367, 372 (1987)).

Here, on the record before the Court as of the time the motions were filed, genuine issues of fact exist as to both requirements of a permissible inventory search.[26] Defendants did not provide any standards, policies, or practices of

_____

[26] During the first hearing on the motions, the Court noted that Defendants' Motion was due to be denied as to the search of the vehicle challenged in Count III in part due to the absence of any record evidence regarding CCSO polices and procedures relating to inventory searches. On September 9, 2021, Defendants filed Defendants' Motion to Supplement the Record in Support of Defendants' Motion for Summary Judgment (Doc. 75; Motion to Supplement)in which they sought to address this deficiency. Webb expressed his opposition to the request. Id. at 5. The Court held a hearing on the Motion to Supplement on September 21, 2021. After hearing from counsel, the Court determined that the Motion to Supplement should be denied given the procedural posture of the case. Nevertheless, the Court determined that it would permit the filing of supplemental motions for summary judgment as to the remaining claim

CCSO that would establish that Deputy English had authority to impound or tow Webb's vehicle or that his inventory search of the vehicle followed CCSO's standard procedures. Further complicating Defendants' reliance on the inventory search exception is the question of whether any CCSO inventory search policy applies only if a vehicle is impounded or also to a vehicle that is towed. Deputy English testified he never impounded Webb's vehicle. English Dep. at 69. And both Deputy English and Corporal Kirby suggested that the tow company, rather than CCSO, had custody of Webb's vehicle following the arrest. English Dep. at 66, 73-74; Kirby Dep. at 57. If CCSO policy distinguishes between impounding a vehicle and towing a vehicle, such distinction could have implications on the applicability of the inventory search exception under the Fourth Amendment. See Sammons v. Taylor, 967 F. 2d 1533, 1543 (11th Cir. 1992) (noting a lawful impound of a vehicle is a condition to performing an inventory search).

Given the absence of the pertinent CCSO policies and the questions of fact that remain regarding whether the vehicle was, or needed to be, impounded and the reasons for the search, summary judgment in favor of either Webb or Deputy English would be inappropriate. That said, the Court does have sufficient undisputed evidence to determine Webb has failed to provide any

---

in Count III after the parties attended a settlement conference.

evidence that Corporal Kirby was involved in the decision to conduct the subject search of Webb's vehicle or participated in it. Indeed, the undisputed evidence shows Corporal Kirby did not discuss a search of the vehicle with Deputy English and was not on the scene when Deputy English searched the vehicle. Video at 0:32:15-0:38:05; English Dep. at 71. Without any evidence of wrongdoing, Webb's claim against Corporal Kirby cannot be sustained as a matter of law. Therefore, judgment in favor of Corporal Kirby as to Count III is appropriate. Otherwise, both motions are due to be denied as to the claim in Count III that Deputy English's search of the vehicle violated Webb's Fourth Amendment right.

### c. Count V

Webb's final Fourth Amendment claim relates to Officer Dampier's presence in the Jail's changeout room when Webb was required to strip naked and don his jail attire. Webb characterizes this interaction as a strip search and relies in part on Florida Statutes section 901.211 to support its unreasonableness.[27] However, Webb's claim fails because his right to be free

---

[27] A violation of a state right, such as the one established in section 901.211, is not a per se constitutional violation. See Knight, 300 F.3d at 1276 ("While the violation of state law may (or may not) give rise to a state tort claim, it is not enough by itself to support a claim under section 1983."). As such, the Court does not consider whether Defendants violated section 901.211 because the issue is unnecessary for the Court's analysis under the Fourth Amendment.

from strip searches as a routine part of being booked into a county jail is not clearly established.

In Florence v. Board of Chosen Freeholders of Cnty. of Burlington, the Supreme Court considered a jail procedure requiring all arrestees, even those who were arrested for minor offenses, to be subject to a strip search before being admitted to the general jail population irrespective of whether law enforcement officers had reasonable suspicion they were hiding contraband. 566 U.S. 318, 323 (2012). The Supreme Court upheld the policy, finding that it "struck a reasonable balance between inmate privacy and the needs of the institutions." Id. at 339. However, the Court specifically refrained from answering the question before this Court. Id. at 338-39 ("This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees.").

The Eleventh Circuit has also considered similar issues en banc. In Powell v. Barrett, five arrestees were strip searched during the routine booking process at a county jail despite law enforcement officers having no reasonable suspicion that they might be concealing contraband. 541 F.3d 1298, 1300 (11th Cir. 2008). In framing the issue before the full court, the Eleventh Circuit stated, "[w]e granted rehearing en banc to decide whether a policy or practice of strip searching all arrestees as part of the process of booking them into the

general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband, is constitutionally permissible." <u>Id.</u> The court answered that question "in the affirmative," so long as the strip searches were no more intrusive than the one the Supreme Court upheld in <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979).[28]

Webb points out that <u>Powell</u> is distinguishable because the arrestees in <u>Powell</u> were "being placed into the general population of a facility," while Webb was isolated in his own cell awaiting a bail bondsman. Webb's Response at 18-19. This argument is not without some merit, as the Supreme Court has questioned the reasonableness of strip searching individuals like Webb who (1) are arrested for minor offenses, (2) pose no obvious danger, and (3) can be segregated from the general jail population before their release. <u>See</u> <u>Florence</u>, 566 U.S. at 339 (noting "[t]he accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue."); <u>see also</u> <u>id.</u> at 340-42 (Alito, J., concurring).

Even so, in the context of qualified immunity, posed-but-undecided questions of constitutionality do not clearly establish a right. Without any binding precedent clearly establishing Webb's right to be free from strip

---

[28] In <u>Bell</u>, the detention facility had a policy of performing strip searches and cavity inspections of every inmate following contact with a person from outside the facility. 441 U.S. at 558.

searches as part of the booking process at the Jail, Deputy English and Corporal Kirby are entitled to qualified immunity. Since Webb cannot provide such authority, the Court is compelled to find Webb's claim related to the strip search he arguably[29] endured at the Jail is barred and summary judgment in favor of Deputy English and Corporal Kirby as to Count V is appropriate. Thus, as to Count V, Defendants' Motion will be granted, and Webb's Motion denied.

### B. Municipal Liability Claims[30]

#### i.  Count VI

A municipality may be liable in a § 1983 action "only where the municipality <u>itself</u> causes the constitutional violation at issue." <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092, 1115 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the municipality was the "moving force" behind the alleged constitutional deprivation. <u>See</u> <u>Monell v. Dept. of Soc. Servs. of City of New</u>

---

[29] There is some dispute over whether Officer Dampier actually conducted a strip search of Webb. For purposes of this decision, the Court construes the dispute in Webb's favor and analyzes the claim as if Officer Dampier did observe and inspect Webb while he changed into jail attire in the changeout room.

[30] The Court limits its consideration of Webb's municipal liability claims to Counts I, III, IV, and V because the Court has found that as to Count II, there was no constitutional violation. And as such, there can be no municipal liability for the Individual Defendants' actions. <u>See</u> <u>Case v. Eslinger</u>, 555 F.3d 1317, 1328 (11th Cir. 2009) (affirming district court's conclusion that there could be no municipal liability in the absence of a constitutional violation); <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1264 n. 7 (11th Cir. 2007) ("we need not address Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred"); <u>Rooney v. Watson</u>, 101 F.3d 1378, 1381-82 (11th Cir. 1996) (finding it unnecessary to consider claims of municipal liability based on either a policy or custom or a failure to train because the court had determined that no constitutional violation occurred).

York, 436 U.S. 658, 693-94 (1978). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" Grech v. Clayton County, 335 F.3d 1326, 1329 n.5 (11th Cir. 2003) (en banc) (quotation omitted). Indeed, municipal liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-84 (1986)). A municipality will rarely have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the municipality has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." Sewell, 117 F.3d at 489.

In support of Count VI, Webb offers virtually no evidence. Other than Deputy English's comment to Webb's mother at the scene that he personally would pull over anyone who displayed similarly obscene messages or depictions like Webb's Sticker, the record is devoid of any evidence related to any official policy or custom of arrests without probable cause or retaliatory arrests that predated Webb's traffic stop. Notably, Deputy English and Corporal Kirby testified they had never pulled over an individual for displaying a bumper sticker that was arguably obscene. English Dep. at 22; Kirby Dep. at 45. Webb presents no contrary evidence. He also presents no evidence of any official policy or a custom or practice of conducting unlawful searches of vehicles. Last, the record is devoid of any CCSO policies or customs requiring or permitting a strip search of an individual such as Webb arrested for a misdemeanor offense. See Dampier Dep. (noting that "when someone is arrested for a misdemeanor, they are not required to be strip searched"). Absent an express policy or a persistent pattern of similar constitutional violations, Webb's claim for municipal liability fails and Defendants' Motion for summary judgment in favor of the Sheriff as to Count VI is due to be granted. For the same reason, Webb's Motion is due to be denied as to Count VI.

### ii.    Count VII

With respect to the Sheriff's alleged failure to train, "the inadequacy of police training may serve as the basis for § 1983 [municipal] liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . ." <u>City of Canton</u>, 489 U.S. at 388 (1989). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." <u>Connick v. Thompson</u>, 561 U.S. 51, 61 (2011) (quoting <u>Board of Comm'rs of Bryan Cnty. v. Brown</u>, 520 U.S. 397, 410 (1997)) (internal quotations omitted). Only in "rare" circumstances where "the unconstitutional consequences of failing to train [are] so patently obvious" will a municipality be liable absent a preexisting pattern of constitutional violations.[31] <u>Connick</u>, 561 U.S. at 64.

In this case, Webb fails to provide evidence of any prior incidents that would place the Sheriff on notice that there was a need to train his deputies on the intersection of the First Amendment and section 847.011. Moreover, all law enforcement officers receive some basic instruction on the First Amendment as part of their academy training. <u>See</u> Kirby Dep. at 26-27. Webb provides no

---

[31] <u>E.g.</u>, <u>Connick</u>, 561 U.S. at 63-64 (theorizing that failure to train armed law enforcement officers on dealing with fleeing felons could result in liability for failure to train absent a preexisting pattern of constitutional violations).

evidence and no legal authority to support a patently obvious need for further training as to either the First Amendment or the Fourth Amendment such that the Sheriff's failure to require it amounted to deliberate indifference to Columbia County residents' First and/or Fourth Amendment rights. Therefore, Defendants' Motion will be granted to the extent that summary judgment in favor of the Sheriff as to Count VII is appropriate. Webb's Motion as to Count VII will be denied.

Accordingly, it is

**ORDERED:**

1.   Defendants' Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 57) is **GRANTED in part**. Defendants are entitled to judgment in their favor as to Counts I, II, IV, V, VI, VII, and VIII. Defendant Chad Kirby and Mark S. Hunter are entitled to judgment in their favor as to Count III. It is **DENIED** as to Defendant Travis M. English's request for summary judgment on Count III.

2.   Plaintiff's Motion for Partial Summary Judgment (Doc. 58) is **DENIED**.

3.   At the request of the undersigned, the Honorable Patricia D. Barksdale, United States Magistrate Judge, has agreed to conduct a settlement conference.   Counsel should expect to receive a

communication from Judge Barksdale's chambers regarding the scheduling of the settlement conference and must promptly respond and participate in good faith.

**DONE AND ORDERED** in Jacksonville, Florida this 23rd day of September, 2021.

**MARCIA MORALES HOWARD**
United States District Judge

lc29

Copies to:

Counsel of Record
Pro Se Parties